**Sheila MEAD and Terry Oakley, Individually and on behalf of all persons similarly situated, Plaintiffs,**

and

**Equal Employment Opportunity Commission, Plaintiff-Intervenor,**

v.

**UNITED STATES FIDELITY AND GUARANTY COMPANY, L. K. Merz, Howard Gould, Robert Rowe, and John H. Aitken, Defendants.**

Civ. Nos. 4–77–16, 4–77–42.

United States District Court,
D. Minnesota,
Fourth Division.

Sept. 14, 1977.

Frank E. Vogl, Frederick W. Morris, Thomas D. Carlson, Best & Flanagan, Minneapolis, Minn., for plaintiffs.

Grant E. Morris, Katherine Savers McGovern, E.E.O.C., Washington, D. C., for plaintiff-intervenor.

Timothy R. Thornton, David J. Byron, Rider, Bennett, Egan, Johnson & Arundel, Minneapolis, Minn., for defendants.

### FINDINGS OF FACT, CONCLUSIONS OF LAW, ORDER FOR JUDGMENT ON PLAINTIFF MEAD'S § 704(a) RETALIATORY DISCHARGE CLAIM

MILES W. LORD, District Judge.

### JURISDICTION

This matter originally came on for hearing on plaintiff Sheila Mead's Motion for Temporary and Preliminary Relief filed on January 13, 1977, and plaintiff Equal Employment Opportunity Commission's Petition for Temporary Relief filed on February 1, 1977, pursuant to Section 706(f)(1)(2) and (3) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(1)(2) and (3), as amended by Public Law 92–261, 88 Stat. 103 (March 24, 1972) [Title VII]. Jurisdiction was vested in this Court to hear the matter by § 706(f)(1)(2) and (3) of Title VII, 42 U.S.C. § 2000e–5(f)(1)(2) and (3) and 28 U.S.C. §§ 451, 1343, and 1345. The parties stipulated that the actions be "consolidated for the limited purpose of determining the issue of retaliatory discharge of Sheila Mead since both causes involve common questions of law and fact, and that consolidation will reduce cost and delay." On, February 3, 1977, this Court ordered Consolidation pursuant to the stipulation.

Hearings were held on the request for temporary relief on January 14, 24, 25, 26, 27, February 7, 8, 9, 10, 11, 23, 25 and May 12, 1977. At the May 12, 1977, hearing the Court announced its intention to bifurcate the Mead retaliation claim from the remainder of the action, pursuant to rule 42(b) of the Federal Rules of Civil Procedure and to order the trial of the § 704(a) Mead retaliation claim on the merits to be advanced and consolidated with the hearing on the requests for temporary relief. The Court so ordered by its Memorandum and Order dated June 8, 1977, specifically directing that the issue to be resolved by the hearing on the merits of the Mead retaliation claim was "whether or not plaintiff Mead's termination was in violation of Section 704(a) of Title VII and, if so, what appropriate remedies, if any, should follow therefrom." The Court's Memorandum on Jurisdiction, dated July 8, 1977, addresses the basis of the Court's jurisdiction over the petitions for temporary relief and the trial on the merits of the § 704(a) Mead retaliatory discharge claim.

On July 12, 1977, the Equal Employment Opportunity Commission, [hereafter EEOC

or the Commission] issued Ms. Mead a Right to Sue letter on her § 704(a) retaliatory discharge claim. By its Memorandum and Order on Intervention, dated August 15, 1977, this Court granted the Motion of the EEOC to Intervene in the § 704(a) Mead retaliatory discharge claim. The final hearing on the merits of that claim was also held on August 15, 1977.

After hearing and observing witnesses, reviewing the exhibits received in evidence, the affidavits, the certification, and considering the Verified Complaint, the Motion for Temporary Relief, the Petition for Temporary Relief, the briefs and arguments of counsel and reviewing all the files, records and proceedings herein, the Court makes the following FINDINGS OF FACT, ADDITIONAL CONCLUSIONS OF LAW, AND ORDER:

## FINDINGS OF FACT

1. Plaintiff Sheila Mead is a female U. S. Citizen and resident of the State of Minnesota.

2. Plaintiff Equal Employment Opportunity Commission is an administrative agency of the United States Government charged with the enforcement of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e, et seq.

3. Defendant United States Fidelity and Guaranty Company [hereafter USF&G] is a Maryland corporation with its principle place of business in Baltimore, Maryland. Defendant USF&G does business in the State of Minnesota, with a branch office located in Minneapolis, Minnesota, where it is engaged in the insurance industry and related activities and, as such, is engaged in an industry affecting interstate commerce. At all times relevant herein, USF&G has employed more than 15 persons, has been an employer within the meaning of § 701(b) of Title VII, 42 U.S.C. § 2000e(b), and has been engaged in an industry affecting commerce within the meaning of § 701(h) of Title VII, 42 U.S.C. § 2000e(h).

4. On March 27, 1972, Ms. Sheila Mead was employed by defendant USF&G as a multi-line rate clerk/typist in the Fire and Marine Department. Ms. Mead worked for USF&G until January 7, 1977 when her employment was terminated.

5. Defendant L. K. Merz was, until January 7, 1977 and at all material times prior thereto, the branch manager in charge of the Minneapolis office of defendant USF&G (TR. 158–160). Defendant Howard Gould is and has been at all material times hereto the Superintendent of the Fire, Marine and Multi-Line Department [Fire Department] of the Minneapolis office of defendant USF&G (TR. 329). Defendant Rowe is and has been at all material times hereto the Assistant Superintendent of the Fire Department of the Minneapolis office of defendant USF&G (TR. 43–45). Defendants Merz, Gould and Rowe are agents of defendant USF&G within the meaning of 42 U.S.C. § 2000e(b).

6. On or about May 5, 1976, plaintiffs Sheila Mead and Terry Oakley filed timely administrative charges against defendant USF&G with the EEOC and the Minnesota Department of Human Rights. Plaintiff Mead filed her charge on behalf of herself and a nationwide class of all female employees employed by USF&G and alleged that USF&G has and is discriminating against both herself and all other female employees on the basis of sex with respect to hire, tenure, compensation, terms upgrading, conditions, facilities and privileges of employment. Ms. Mead further alleged that her employer, USF&G, has and is discriminating against both herself and all other female employees employed throughout the Company by having a practice of treating disabilities related to pregnancies and childbirth differently from other temporary disabilities and by discriminating against female employees because of their pregnancies by treating them differently with respect to compensation, terms, conditions, and privileges of employment. On July 29, 1976 Ms. Mead amended her charge on behalf of herself and all other women employees at USF&G to state that, in addition to the unlawful discrimination charges which she had alleged her employer prac-

ticed in the May 5, 1976 charges, she alleged that USF&G as an employer discriminates against herself and all other women in its consideration of applications for jobs, promotions, and training, and with respect to compensation, conditions and privileges of employment. Additional charges of unlawful employment discrimination on the basis of sex were filed against USF&G with the EEOC and the Minnesota Department of Human Rights on or about October 11, 1976 by Amy Quinn LaVoie and Lesley Deaton; and on November 5, 1976 by Lynn Sibernagel. On or about January 11, 1977, the EEOC issued plaintiff Mead a Notice of Right to Sue on her charges (Pl. Exs. 22, 23, 24, and 25).

7. On or about January 10, 1977, Sheila Mead filed a charge with the EEOC which asserted that she had filed sex discrimination charges with the EEOC on May 5, 1976, and that thereafter, USF&G retaliated and discriminated against her for having filed the charge by unfairly overloading her with work, depriving her of the assistance provided similarly-situated employees, preparing adverse work reports and, on January 7, 1977, discharging her.

8. On January 13, 1977, plaintiff Mead filed a Complaint in federal district court pursuant to Sections 703 and 704(a) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–2, 3(a) and filed a Petition for a temporary restraining order, and for preliminary and permanent injunctive relief under Rule 65 of the Federal Rules of Civil Procedure. In Court I of her Complaint Ms. Mead alleges that USF&G has and continues to discriminate against herself and a nationwide class of all its female employees by operating under company-wide policies and practices which limit and discourage recruitment of women, which discriminate against women with respect to hiring, job classification, management training programs, disabilities related to pregnancies, promotions and other terms and conditions of employment. That charge is not before this Court at the present time, except insofar as it is alleged to be the basis of and cause for the Company's retaliation, harassment, reprisals, and, ultimately, discharge of Ms. Mead.

Count II of the Complaint, which is the subject of the present proceedings, alleges that in May, 1976, the defendants learned of the sex discrimination charges filed by Ms. Mead on May 5, 1976, and that thereafter, in retaliation for filing that charge, the defendant USF&G through its agents harassed, intimidated and coerced plaintiff Mead by, among other things, monitoring her work with greater frequency than other employees similarly situated, depriving her of assistance provided other employees similarly situated, making unsupported adverse review about her work and discharging her.

9. Upon receipt of Ms. Mead's § 704(a) charge, the Commission conducted a preliminary investigation into the alleged retaliation. Based upon its preliminary investigation, the Commission concluded that prompt judicial action was necessary to carry out the purposes of the Title. On February 1, 1977, the Commission filed a Petition for Temporary Relief, and related pleadings, pursuant to Section 706(f)(2) and (3) of Title VII, 42 U.S.C. § 2000e–5(f)(2) and (3) in the United States District Court. On February 3, 1977, based on the Stipulation of Counsel for plaintiffs Mead and EEOC and defendants USF&G, Merz, Gould and Rowe, the Court ordered consolidation of the Motion of Plaintiff Mead and the Petition of Plaintiff EEOC. On or about July 14, 1977, the EEOC issued plaintiff Mead a Notice of Right to Sue on that charge of retaliation.

10. In the early part of May, 1976, defendant Merz, the Branch Manager of the Minneapolis Office of USF&G, received copies of the complaints Sheila Mead had filed with the EEOC and the Minnesota Department of Human Rights, and he spoke with the home office and department superintendents about those complaints. (TR. 161–62). Fire and Marine Department Superintendent Gould and Assistant Superintendent Rowe were also notified in early May that Ms. Mead had filed charges with the EEOC alleging sex discrimination by defendant USF&G. (TR. 383–75).

11. There are six positions in the Fire Department at USF&G: Superintendent,

Assistant Superintendent, Underwriter, Assistant Underwriter, rater and code clerk (TR. 364–367). The next promotion from the position as an Assistant Underwriter A is to the position of Underwriter (TR. 375–376). For a period of at least 16 years and until sometime after plaintiff Mead filed her sex discrimination charges on May 5 and July 29, 1976, no female employee had ever held the position of Underwriter, Assistant Superintendent or Superintendent in the Fire Department (TR. 372, 537). For this 16 year period and up to the present, no male employee has ever held the position of Assistant Underwriter, Code Clerk or Rater (TR. 364–367, 538).

12. Plaintiff Mead commenced employment with defendant USF&G on March 26, 1972 and received training for her job as a multi-line rate clerk. This training consisted of another multi-line rater sitting at Ms. Mead's desk with her and going over rating projects and answering questions. In 1972 and 1973 Ms. Mead conducted training sessions for two new employees in the Fire and Marine Department.

13. Plaintiff Mead established a very good work record with defendant USF&G over several years of employment (Pl. Exs. 7–12). Plaintiff Mead's record establishes the following merit pay increases and promotions:

| | |
|---|---|
| March 26, 1972 | Plaintiff Mead was hired as a rate clerk typist grade 7 in the Fire Department at $110.00 per week (Pl. Ex. 7) |
| August 27, 1972 | Plaintiff Mead received a merit increase of $8.50 per week (Pl. Ex. 8) |
| April 22, 1973 | Plaintiff Mead was promoted to Assistant Underwriter B and received a merit increase of $10.50 per week (Pl. Ex. 9) |
| October 7, 1973 | Plaintiff Mead received a merit increase of $11.00 per week (Pl. Ex. 12) |
| May 4, 1974 | Plaintiff Mead was promoted to Assistant Underwriter A and received merit increase of $12.00 per week (Pl. Ex. 10) |
| June 29, 1975 | Plaintiff Mead received a merit increase of $11.40 per week (Pl. Ex. 11) |

14. During 1975 there were three assistant underwriters in the Fire and Marine Department at USF&G's Minneapolis branch office: Ms. Sheila Mead, Miss Ellen Bunting, and Mrs. Laura Steinert. The Superintendent of the Fire and Marine Department was Mr. Howard Gould. Mr. Gould has been Superintendent of the department for 16 years, and has been an employee of USF&G for 29 years. The Assistant Superintendent of the Fire and Marine Department was Mr. Robert Rowe. Mr. Rowe has been Assistant Superintendent, since 1972, and has been employed by USF&G for 13 years. As Assistant Superintendent, Mr. Rowe was Ms. Mead's immediate supervisor.

15. The issue before this Court is whether or not the defendants lawfully terminated Ms. Mead's employment at USF&G. It is the contention of the defendants that Ms. Mead did not properly perform the duties of an assistant underwriter and therefore that her discharge was justified by poor work performance. In order to evaluate this contention, it is necessary to compare the duties of an underwriter to those of an assistant underwriter in the Fire Department, to examine what those duties are, whether or not they are clearly and consistently defined, and to what extent they overlap.

16. An underwriter in the Fire and Marine Department has as a primary responsibility the judgmental decision of whether or not USF&G will accept a particular risk and write an insurance policy for such a risk. An underwriter's job is a judgmental job that calls for the exercise of a great deal of discretion in determining whether or not to write a particular risk. In order to make the underwriting decisions involved, it is necessary that the underwriter have information about the risk in order that he may judge the company's exposure in accepting a risk. Moreover, the underwriter must know the premium that will be charged for the risk in determining whether acceptance of the risk is likely to be profitable.

17. The primary responsibility of a multi-line rate clerk and an assistant underwriter is to assist the underwriters. The distinction between an assistant underwriter A and multi-line rate clerk is that an assistant underwriter A has more responsibility, is paid more and has the ability to rate more varied lines of insurance.

The assistant underwriter or rate clerk renders assistance to the underwriter by calculating the premium to be charged. This process is called "rating." Both Howard Gould, the Superintendent of the Fire, Marine and Multi-Line Department of the Minneapolis Office of USF&G, Ms. Mead's department, and Robert Rowe, the Assistant Superintendent of the Fire Department, testified about the nature of the assistant underwriter's duties. Mr. Gordon Hies, an underwriter with the Fire Department for one year and nine months and Mr. William Allen Stanley who had been an underwriter for three years during the time of Ms. Mead's employment also testified about the nature of the job.

This Court finds that the only clear conclusion which can be drawn about the duties comprising the assistant underwriter's job and the nature of the interrelationship between the assistant underwriter's and underwriter's job is that neither the jobs nor the interrelationship has been clearly and consistently defined at USF&G. This Court further finds that neither job duties nor their interrelationship has been clearly and consistently communicated to the underwriters and the assistant underwriters at USF&G. Defendant Gould's testimony about the nature of the jobs and the relationship between them contradicted Mr. Rowe's testimony. Mr. Rowe's description of the duties was internally inconsistent, contradictory, and, as he conceded, entirely subjective and unguided by any regularly used objective Company guidelines that he could refer to from the witness stand.

For example, one unclarified area of dispute was over who was to gather the basic information on the subject of an insurance application, and how serious the error was in the event of failure to gather the information. Initially, Mr. Rowe testified that if the information was inadequate the assistant underwriter should contact the underwriter. If the underwriter agreed that the information was insufficient, someone would contact the source (the agent or the applicant). At this point, Mr. Rowe testified that it was not a major error for an underwriter to send an assistant underwriter insufficient information, but that it was a major error if the assistant underwriter proceeded to develop the rate on the basis of insufficient information. He answered affirmatively when he was asked if he expected more of an assistant underwriter than of an underwriter. Later, however, Mr. Rowe testified that it was the duty of the assistant underwriter alone to determine if she had received sufficient information to enable her to develop the rate on the subject to be insured. If she had received inadequate information, it was the assistant underwriter's duty to contact the agent or applicant without first consulting the underwriter. At this point Mr. Rowe explained that the obligation was solely that of the assistant underwriter because the underwriter, for example, might have received the request for insurance through the mail and would merely pass it on to the assistant underwriter.

18. The rating process performed by the assistant underwriter is not an objective determination of the proper rate for the proper risk, for the following reasons. First, the steps to be taken in the rating process are not consistently and clearly defined in the Fire Department. Second, there is discretion in the rating process to determine when the information is complete and where the rate comes from. Third, the norm by which to determine adequate performance is subjective, as conceded by Ms. Mead's immediate supervisor, Mr. Rowe.

19. There are different types of insurance policies which assistant underwriters in the Fire Department work on. A package policy is a policy insuring against a number of perils for a particular risk. The varied coverages involved in a package poli-

cy can complicate the rating process. A risk that involves a number of locations can also complicate the rating process.

Commercial insurance policies are commercial risks and often provide for insurance against a number of perils. When a single policy is issued that insures against multiple perils, it is called a package policy. USF&G issues three types of package policies. These policies are referred to as SMPs, CIPs, and MIPs. On SMP policies the rating of the property and fire coverage as well as the casualty and general liability coverage is performed by the Fire and Marine Department. On CIP policies and MIP policies the property and fire rating is done by the Fire and Marine Department and the general liability rating is done by the Casualty Department.

20. An assistant underwriter is also called upon to complete premium adjustment reporting forms. Premium adjustment reporting forms are used when an insurance policy is issued to insure a risk with fluctuating value. For example, a merchant wishing to insure his inventory with a fluctuating value uses a reporting adjustment form. The merchant reports the value of inventory every month and that value is recorded. At the end of the policy period, one year or three years, the monthly values of the merchant's inventory are averaged and the premium figured. The merchant then receives a refund or additional billing for premiums.

21. USF&G concedes that Ms. Mead's work performance was satisfactory until April, 1975, at which time it allegedly began to become unsatisfactory. One complaint made in support of the charge of unsatisfactory performance is that Ms. Mead was unable to competently complete premium adjustment reporting forms. The difficulty with reporting forms was allegedly one of the "basic errors" which justified the discharge. However, this Court finds on the basis of a review of the record as a whole, that this allegation was only a pretextual reason given to justify the discharge in retaliation for the filing of the sex discrimination charge.

There is no record of Company dissatisfaction with Ms. Mead's performance on premium adjustment forms until the Rowe memo of August 6, 1975 (Def. Ex. 2). This is because, as Mr. Gould, the Fire Department Superintendent testified, Casey Jones was the sole person assigned to make out premium adjustment forms up until 1975 and no one else worked on them before she left the department. Ms. Mead did not start working on final adjustment forms until sometime in 1975. Moreover, Ms. Mead had no prior experience with these forms at USF&G and she had not been trained in her previous job to work on the adjustment forms because the work on them had been done by a special unit.

After Casey Jones left, Ellen Bunting, Laura Steinart and Sheila Mead took turns working on the forms. Then Ellen Bunting asked if she could exclusively handle the forms and was permitted to. The adjustment forms were not put on Ms. Mead's desk again until December, 1975. Ms. Mead's pregnancy leave commenced on December 15, 1975, and she returned to work on April 26, 1976.

The only person who was able to cite a specific example of Ms. Mead's poor performance on the adjustment reporting forms was Ms. Mead, herself. She testified that she had trouble with adjusting the rate for the insured Peter Van Erkl. Finally she asked her co-worker, Mrs. Laura Steinart, to check over her work. Mrs. Steinart checked it over, told Ms. Mead that was the way she would do it. Ms. Mead had the rate typed up and mailed out. Two weeks later it was returned to her as "wrong." (TR. 672–75).

This incident does not indicate that Ms. Mead was lax or negligent in her attempts to fill out the final adjustment reporting forms. To the contrary, when she had difficulty, Ms. Mead consulted another employee who was reputed to be very competent in handling these forms. Moreover, in so doing, Ms. Mead resorted to the only available on-the-job aid present at USF&G. To level the blame for this incident against Ms. Mead, without any simultaneous criti-

cism of the review of Ms. Mead's work by Mrs. Steinart supports this Court's conclusion that citing Ms. Mead's inadequate performance on the final adjustment forms was a pretextual reason for firing her.

22. The types of insurance coverage and the costs of such coverage are continuously fluctuating. Changes in insurance coverage and cost of insurance coverage requires changes in the rating manual. Assistant underwriters are responsible for insuring that their rating manuals and rule books are up-to-date so as to reflect the current coverages and insurance costs.

23. Another allegation made to justify Ms. Mead's discharge in 1977 for unsatisfactory work performance was that Ms. Mead failed to keep her manuals up to date. However, the only evidence offered to prove this assertion was the following. Mr. Gould testified that sometime in 1975, prior to Ms. Mead's maternity leave, Mr. Rowe found manual pages in a file. Ms. Mead was said to have been the only person working on the file and so it was concluded that the pages belonged in her manual. However, Mr. Gould was unable to identify the name of the file in which the pages were found and unable to state that the pages did not relate to that particular file. No record was made of the incident at the time it occurred. Neither Mr. Rowe nor Mr. Gould could recall any other instance when Ms. Mead's manual pages had been out of place or out of date. (TR. 382–83, 411–14).

The evidence is very scanty here and the Court is tempted to reject it. But even if the evidence is taken at its best and viewed in the light most favorable to the defendants, this Court finds that there was evidence of only one isolated incident when Ms. Mead's manual pages were not in her manual. No other evidence was offered to prove that her manual pages were out of place or out of date. The evidence does not support the initial allegations that there was a pattern of such incidents. To the contrary, the evidence shows only that on one occasion, Ms. Mead may have inadvertently left the pages from her manual in a case file which she was working on. To cite this one isolated incident as a reason for the allegedly poor work performance which resulted in her discharge well over one year later, leads to the inference that the reason given for discharge was merely a pretextual one, without actual merit.

24. During the late winter and early spring of 1975, Ms. Mead was having marital difficulties. It is the contention of the defense that as a result of these difficulties, there was a decrease in the quantity and quality of work performed by Ms. Mead. The Court finds that the evidence did not support the contention. Among other things, Ms. Mead received a merit increase of $11.40 per week on June 29, 1975. The raise itself suggests that Ms. Mead's work up to that time was satisfactory and there was no memo to the contrary in her file as of that date.

25. USF&G asserted that an indication of Ms. Mead's unsatisfactory performance was excessive personal use of the telephone. But, the inferences to be drawn from the evidence were inconclusive as to the amount of time Ms. Mead spent on personal telephone calls in the spring of 1975 in comparison to the amount of time spent on such calls by the other employees. No records were kept monitoring the amount of personal telephone calls made by employees. Nor was there any objective method available for discerning how frequently employees made such calls or whether a three minute call was a business call to an agent or a personal call.

In fact, the evidence indicated that Mrs. Laura Steinart was the source of supervisor Rowe's information regarding Ms. Mead's use of the telephone. (TR. 1010). Moreover, Mrs. Steinart testified that while she knew that Sheila Mead was on the phone for personal reasons, she did not know whether the people who sat near her were on the phone for personal reasons or not. Furthermore, Mrs. Steinart stated that with the exception of one girl who came to work late for three weeks, the only people she had made adverse reports to Mr. Rowe about were Sheila Mead and two others who had filed sex discrimination claims with the EEOC (1038–39).

Finally, Mrs. Steinart stated that she had never taken written notes specifying the times and dates of Ms. Mead's use of the phone, but had just made her reports verbally.

It was conceded by the Assistant Superintendent that Ms. Mead was the only employee who had ever had a written memo inserted into her personal file evaluating her use of the telephone for personal matters.

26. Laura Steinart testified that she was asked in 1975 by Superintendent Gould to report problems in the department to him or Robert Rowe. (TR. 1024). Mrs. Steinart admitted that she observed Ms. Mead's behaviour more than that of the others in the department and that she only reported the infractions of Ms. Mead and the other two women in her department who had filed sex discrimination charges. (TR. 1031, 1040).

27. On June 12, 1975, Ms. Mead was advised by her doctor that she was pregnant. (TR. 572–74). Assistant Superintendent Rowe, Ms. Mead's immediate supervisor, was informed of Ms. Mead's pregnancy by August 12, 1976 at the latest. (TR. 575, 918, 951). The secretary to Mr. Merz, the Manager of the Minneapolis office, knew of Ms. Mead's pregnancy prior to August 1, 1975. (TR. 545). William Stanley, an underwriter in the Fire Department, found out that Ms. Mead was pregnant during the summer of 1975. (TR. 951). And Ms. Mead gained 18 pounds between March, 1975 and late August, 1975 due to her pregnancy. (TR. 577).

28. Thereafter, although she had never received an adverse memorandum or "write-up" during the prior forty months that she had worked for USF&G and although she had received a merit increase on June 29, Ms. Mead received three adverse write-ups during the period from August 6 through September 11, 1975). (Def. Exs. 1–4, TR. 368–70, 505–06).

Two of these memoranda were the first formal work evaluations Ms. Mead had received since she had been promoted to the position of assistant underwriter in March,

1973, despite a Company policy which called for an annual review of assistant underwriters. When asked why Ms. Mead had received two performance evaluations within a month when she had not received a timely annual evaluation before, the Assistant Superintendent merely stated that the "company likes forms." (TR. 282). The defendants were similarly unable to satisfactorily explain why they had waited until August, 1975, to write up the adverse reports of Ms. Mead when the allegedly inadequate work performance had been a problem since April, 1975.

29. Sometime in November, 1975, Ms. Mead spoke to Mr. Gould, Superintendent of the Fire Department, about a maternity leave of absence and stated that her tentative plans were to return to work about the first of March, 1976. Mr. Gould said that was fine and requested that she call the Company a couple of weeks before she wished to return. On December 15, 1975, Ms. Mead commenced her pregnancy leave.

30. Ms. Mead visited Mr. Gould at USF&G on February 16, 1976 and requested an extension of her pregnancy leave until April 12, 1976. He told her that was fine and that she should call a couple of weeks before she returned. (TR. 588). Ms. Mead spoke with Mr. Gould again on March 11, 1976.

Mr. Gould called Ms. Mead during the third week of March, 1976, and asked her if she was planning to return to work. She responded affirmatively. Mr. Gould called again on April 7, 1976 to ask if Ms. Mead was going to return to work. When she responded affirmatively, Mr. Gould stated that he hadn't known that she wanted her job back and that he would have to speak with Mr. Merz to see if she could get her job back. (TR. 590–91). Ms. Mead returned to work on April 26, 1976.

31. Prior to Ms. Mead's return to work, Superintendent Gould called a meeting with the other two Assistant Underwriters, Ellen Bunting and Laura Steinart. These two women had made adverse reports to Assistant Superintendent Rowe which he, in turn,

had incorporated into a memo to Superintendent Gould on August 12, 1975. At that time Mr. Rowe had made the following evaluation of the remarks of Mrs. Steinart and Miss Bunting about Ms. Mead's performance:

. . . The problem really seems to be one of the rest of the girls being down on her for being such a conversationalist. Her errors while admittedly are present, are greatly magnified when discovered by the other girls. . . . I think we should get the "Big 3" together with Sheila and discuss the fact that harmony, if only on the surface, must come about or our services will suffer.

32. On May 5, 1976 Ms. Mead filed a charge with the EEOC and the Minnesota Department of Human Rights alleging that the defendants USF&G and Manager Merz had discriminated against herself and all other female employees on the basis of sex and that the Company specifically discriminated against women with respect to the treatment of pregnancies. Mr. Rowe and Mr. Gould were notified of these charges shortly thereafter, in the early part of May. (TR. 161–162, 383–85).

33. After the defendants received notice that Ms. Mead had filed her employment discrimination charges with the EEOC and the Minnesota Department of Human Rights, they engaged in the following retaliatory acts, one of their intentions being to document Ms. Mead's personnel file with work-related reasons which could be cited as the pretextual reasons for firing her.

A. After he had become aware that Ms. Mead had filed her employment discrimination charge, Mr. Gould instructed Miss Bunting, Mrs. Steinart and Mr. Rowe to monitor Ms. Mead's work. Mr. Gould specifically instructed the employees to report mistakes made by Ms. Mead to him. (TR. 462, 525).

It was not the regular business practice to have employees monitoring each other's work and report other employees' errors to the Assistant Superintendent or the Superintendent. This Court finds that the monitoring was established in response to the notice that Ms. Mead had filed an EEOC charge.

B. In July, 1976, after he had become aware that Ms. Mead had filed an employment discrimination charge, Mr. Gould gave a project called the City of Fargo quote to Mr. Rowe and specifically told him to have Sheila Mead prepare it because he wanted to monitor her work. (TR. 459, 520). After Ms. Mead worked on the quote, Mr. Gould had Mr. Rowe return it to him and Mr. Gould personally checked the quote for error. It was not the regular business practice for Mr. Gould to check the assistant underwriters' work for errors.

Although Mr. Gould stated that he had run several other spot checks on Ms. Mead's work during 1976, he could not recall anything about the other spot checks: how many there were; when they occurred; or the names of the insureds. (TR. 520–21). When asked why Ms. Mead was not fired at this point, Mr. Gould replied that "You don't fire anybody for one or two mistakes." (TR. 524).

This Court finds that the purpose of the spot checks was to locate some work-related reasons which could be cited as a pretext for firing Ms. Mead because she had filed a charge with the EEOC.

C. On July 1, 1976, Ms. Mead's personnel file was documented with statements she allegedly made to another employee concerning her charges filed with the EEOC. (Pl. Ex. 17).

D. On July 6, 1976, Ms. Mead's personnel file was documented with a minor mathematical error and a "shortcoming" even though prior to the filing of her charges, defendants Rowe and Gould did not have a policy of documenting such matters and had never documented anyone else's personnel file with such minor errors. (TR. 79, 108–109, 113, Def. Exs. 9 and 10).

E. On or about August 16, 1976 defendant Merz wrote a memorandum of his phone conversation with Vice President Adams of defendant USF&G's home office in

Baltimore, Maryland concerning building and documenting a case against plaintiff Mead and Oakley because they filed charges. Among other things, defendant Merz wrote:

If we wish to 'fire' either or both [Plaintiffs Mead and Oakley], we must document the moves of the two of them over a period of time. If discharge should be on the basis of nonproductiveness, their output must be documented, as well as all other people in the department for comparative purposes. We must have a documented case in the event we went to court. (Pl. Ex. 28, TR. 1250–1263).

F. On August 26, 1976, Ms. Mead's personnel file was documented for the alleged misconduct of others (Pl. Ex. 6).

G. Sometime in the fall of 1976, management had knowledge that Ms. Mead had filed her EEOC charge, an incident occurred in the Casualty Department which the Company contended illustrated improper conduct by Ms. Mead. Mr. Dale C. Webster, the Superintendent of the Casualty Department, observed Ms. Mead sitting at a desk with Kathryn Fairchild, an underwriter clerk. When asked what they were doing by Mr. Webster, the women informed him that they were rating a risk. According to his testimony, they could finish the risk, but from now on the underwriter clerk was not to help any Fire personnel with the casualty rating portion of SMP policies unless an underwriter was unavailable. In that event, the underwriter clerk was only to offer help with rates, not rating. According to Ms. Fairchild, Mr. Webster spoke to her alone, admonished her not to help Ms. Mead, and said he would be the "culprit." (TR. 776–804, 740–42).

It is not necessary to make a credibility resolution in order to discern the significance of this incident. SMP policies require casualty rating and rates. Since 1975 Ms. Mead had been seeking help from personnel in the Casualty Department with the casualty portion of the SMP policies and, as Mr. Webster testi-

fied, he had never objected or said anything at all to Ms. Fairchild about assisting Sheila Mead. (TR. 798). The Court takes note of the fact that the purpose of Ms. Mead's visits, as described by Mr. Webster, was obviously work related. Moreover, Mr. Webster testified that it was only after he had knowledge that Ms. Mead had filed a sex discrimination charge with the EEOC that he objected to Ms. Mead obtaining assistance from a casualty underwriter clerk. (TR. 799–800). Thus, Mr. Webster's objection was, in effect, a policy change of an established practice, in response to Ms. Mead's filing of the charges with the EEOC.

Miss Ellen Bunting, another assistant underwriter in the Fire Department, testified that she regularly visited her roommate, Sherri Wood, during work time in the Casualty Department to ask Ms. Wood for Guide A rates and help in classifying. Miss Bunting testified that she visited Ms. Wood every time she had a problem, which might vary anywhere from a couple of times a day to once every three days. (TR. 1085–88). Miss Bunting further testified that she had never been reprimanded or had an adverse memo inserted in her file because she left the Fire Department to speak with Ms. Wood in the Casualty Department. (TR. 1087).

The Company contention that Miss Bunting's visits to Ms. Wood were justified only because Ms. Wood was an underwriter impress the Court as unconvincing and after-the-fact. The pattern which emerges about the visits to the Casualty Department is that until Miss Fairchild was admonished by Mr. Webster, both Miss Bunting and Ms. Mead were permitted to visit their respective roommates and friends in the Casualty Department for help without restriction. The reasonable conclusion to be drawn from these facts is that Mr. Webster's objection and policy change was made in response to and reprisal for the filing by Ms. Mead of her charges with the EEOC.

H. In October, 1976, certain rating changes were circulated to all of the underwriters and assistant underwriters in the Fire Department except plaintiff Mead (Pl. Ex. 1).

I. On or about November 17, 1976, defendant Merz wrote to Doris Martin, defendant USF&G's Equal Employment Officer in Baltimore, Maryland, and, referring to the receipt of the fifth sex discrimination charge since May 5, 1976, stated that:

There is every reason to feel that Ms. Mead will continue to pursue her activities in the office to influence as many people as she can to file complaints nor does there appear to be any way to stop her from this pursuit, according to advice received from you.

On the other hand, the continuation of the filing of the complaints is doing this office absolutely no good whatsoever, and it is obvious to us that some action must be taken to eliminate this situation. (Pl. Ex. 27).

J. On November 18, 1976, Ms. Mead's personnel file was documented with a memorandum addressed to Ms. Martin in Baltimore concerning plaintiff Mead's interest in the problems of alcoholism as it effects defendant USF&G and denying plaintiff access to certain information because "it might lend fuel to the present fire" (TR. 166–167, 185–186, Pl. Ex. 2). In that context and in a memorandum directed to defendant's EEO officer, it is reasonable to infer that the reference to "the present fire" was to plaintiff's sex discrimination charges.

K. On November 19, 1976 Ms. Mead's personnel file was documented with an adverse memorandum concerning events which allegedly took place over one and a half years earlier. (Def. Exs. 18 and 19). In the memorandum, as well as in Court, defendant Gould conceded that "I did not document these discussions at the time (1975) because I didn't feel it was necessary." (TR. 403, Def. Ex. 18).

L. On November 30, 1976, Mr. Merz, Manager of the Minneapolis office of USF&G, wrote Ms. Mead that she would be terminated if she did not make substantial improvements in her job performance. (Pl. Ex. 3). Ms. Mead responded by requesting that she be provided with specific suggestions and additional training in order to improve her allegedly inferior job performance. The defendants did not respond to Ms. Mead's request. (TR. 405, Pl. Ex. 5). There was no explanation for their failure to respond with the exception of an assertion in a memorandum to the Court, that USF&G did not respond because management felt that it was inappropriate to conduct a personnel function through the vehicle of registered mail with copies to attorneys. The Court finds this statement to be totally inadequate as an explanation for the Company's inaction because Mr. Merz's own letter of November 30, 1976 threatening termination of Ms. Mead was sent to Ms. Mead's attorney with blind carbon copies to Mrs. Doris Martin of the Equal Employment Division of the home office, Howard Gould, Robert Rowe, and John 'Aitken, the Associate Manager of the Minneapolis office.

M. On December 1, 1976 a memo was inserted in Ms. Mead's personnel file which alleged that she had taken an extended lunch hour when only two weeks earlier she had been told by her immediate supervisor Rowe that "her attendance [had] been excellent and she is never late." (Def. Exs. 12 and 5).

N. On December 3, 1976, Ms. Mead's personnel file was documented with a memorandum containing repeated references to her EEO charges and allegedly inadequate job performance in 1975, almost a year and a half earlier. (Pl. Ex. 18).

O. On December 13, 1976, Ms. Mead's personnel file was documented for an alleged "backlog" of work which had not been assigned to her, which she was not asked to help clean up, and which was cleaned up by two persons in less than one day. In fact, at the time the backlog occurred there were only two assistant underwriters rather than the normal number of three. A trainee was filling the third

assistant underwriter's position and she was unable to do as much work as either Laura Steinart, whom she replaced, Ellen Bunting, or Sheila Mead. No reference to the backlog was inserted in the personnel files of Miss Bunting, Mrs. Steinart, or the trainee. (TR. 482–99, 606–07, Def. Ex. 11).

P. Assistant Superintendent Rowe individually asked Laura Steinart and Ellen Bunting to write out statements describing the complaints they had about Sheila Mead's work performance. (Def. Exs. 19, 20, TR. 491–93). Both statements were written on December 28, 1976 and inserted into Ms. Mead's personnel file. Although on their face these statements may accurately reflect Mrs. Steinart's and Miss Bunting's opinion of Ms. Mead's work performance, the evaluations must be taken to be the product of the management effort to document Ms. Mead's file and establish a pretextual reason for firing her since the statements were written as a result of the supervisor's request addressed directly to each woman alone.

Q. On January 7, 1977, Mr. Gould informed Ms. Mead that her employment with USF&G was terminated. Mr. Gould informed Ms. Mead that the reason for the termination was "poor job performance," although he also told her that she had a lot of fine qualities and that she wouldn't have any trouble finding a new job. (TR. 506, 609–10). Mr. Gould gave Ms. Mead four weeks of severance pay at the direction of Manager Merz, despite a Company rule which provides for only two weeks salary in lieu of notice upon termination. (TR. 532–33).

34. Defendants have relied heavily upon the allegation that Ms. Mead was constantly making errors. (TR. at 69, 437, 458, 870–71, 928, 1002, 1041). One underwriter testified that for two years Ms. Mead consistently made errors on 50% of the work which she performed for him. (TR. 944). This Court finds that the testimony is unreliable. The witness stated that for two years he had spent more than half of his time reviewing and correcting Ms. Mead's

work, (TR. 954–56), despite the fact that neither Ms. Mead's immediate supervisor, Mr. Rowe, nor Mr. Gould, the superintendent, had referred to this 50% error ratio in their prior testimony. Furthermore, the witness stated that there had been 50% error in Ms. Mead's work since at least December 1974, although Ms. Mead's immediate supervisor Rowe and Superintendent Gould testified that problems did not begin until the spring and summer of 1975.

At one point Mr. Rowe stated that it was his policy to bring errors to Ms. Mead's attention if he felt it was important (TR. at 114.) However, Mr. Rowe could not recall a single discussion with Sheila Mead about errors after she returned from pregnancy leave on April 26, 1976 (TR. at 69). Ms. Mead also testified that she could not recall any comments made to her by anyone in her department about the quality or quantity of her work from April 26, 1976 to November 17, 1976 with the exception of two instances (TR. at 599–600). When considered in the context of Mr. Rowe's statement that he would simply dismiss errors brought to his attention if he felt they were of relatively little "magnitude" (TR. at 113), the absence of conversations with Ms. Mead about alleged errors and the absence of memoranda documenting those errors gives rise to the inference that the errors were not of the frequency or magnitude described by defendant's witnesses. Alternatively, if the errors did occur as alleged, defendants' failure to discuss them with Sheila Mead is contrary to the stated policy of bringing mistakes to her attention (TR. at 114.) If that is so, the Court must have been misinformed regarding the amount of assistance given to Ms. Mead (TR. at 976–77, 941–42, 1074–75, 1076–77).

35. After plaintiff Mead filed the sex discrimination charges in May, 1976, female employees Lesley Deaton and Amy LaVoie spoke with plaintiff about her charges and then on October 11, 1976 filed substantially similar charges themselves. (TR. 164, 178–179, 721–22, 768).

36. After the defendants became aware in October, 1976 of the charges of LaVoie

and Deaton (TR. at 806), they engaged in the following retaliatory actions against them because they had filed charges with the EEOC.

A. Louis Hofstad, a supervisor in the claims department, told the receptionist/secretary in the claims department to maintain a log monitoring the time periods when Lesley Deaton and Amy LaVoie were on coffee and lunch breaks. (TR. 735, 838). No records on this subject were kept by management prior to receipt of their charges and no such records are maintained on other employees.

B. USF&G sent a letter to Ms. Deaton's dentist requesting substantiation of her dental appointments and the nature of her dental treatment. This letter was sent without Ms. Deaton's knowledge or consent. (TR. 735).

C. Doris Martin, the EEO coordinator at USF&G, told Ms. Deaton on or about December 8, 1976, during an office visit by Martin at the Minneapolis branch office, that "no one files a charge against USF&G and just walks away from it." (TR. 729).

D. USF&G began to prepare harsh and critical memoranda of Ms. Deaton. (TR. 725–27).

E. USF&G more than doubled the number of memoranda to Ms. LaVoie. (TR. 833).

F. During the second week in November, 1976, USF&G denied Ms. LaVoie a promotion to a position of outside adjuster on the grounds that she was unqualified, despite the fact that one month earlier (and before receipt of Ms. LaVoie's charge) she was offered that position at another branch office. (TR. 838).

37. The retaliatory acts taken against plaintiff Mead and Amy LaVoie and Lesley Deaton make those employees, as well as Kathryn Fairchild and Susan Shapiro fearful in the matter of filing charges, testifying, or assisting in a proceeding under the auspices of Title VII.[1]

1. By its protective order of May 23, 1977, this Court ordered the non-disclosure of the names of certain employees who specifically cited as

38. In addition to plaintiffs Mead and Oakley, and employees Deaton and LaVoie, employee Lynn Silbernagel filed sex discrimination charges. None of the five employees who filed charges against defendant USF&G were employed there eleven months after plaintiffs Mead and Oakley filed the first charges on May 5, 1976.

39. Defendant's retaliatory conduct has caused plaintiff Mead loss of her jobs, wages, fringe benefits and monetary injury. Plaintiff Mead exercised reasonable diligence in seeking interim employment and made reasonable efforts to mitigate her loss of pay. By stipulation of the parties, plaintiff Mead's loss of wages and fringe benefits because of defendants' retaliatory conduct amounts to $1,619.11 for the period from January 7, 1977 to August 1, 1977.

40. Defendants' retaliatory conduct has caused plaintiff Mead humiliation, pain, suffering and other emotional injury because she exercised her rights under Title VII.

CONCLUSIONS OF LAW AND FACT

1. The Court has jurisdiction over the parties and subject matter jurisdiction of this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., and under 28 U.S.C. §§ 451, 1331, 1343, and 1345.

2. Defendant USF&G is an employer within the meaning of 42 U.S.C. § 2000e(b).

3. Defendants Merz, Gould and Rowe are agents of Defendant USF&G within the meaning of 42 U.S.C. § 2000e(b).

4. All of the statutory requirements of § 706(f)(1), (2) and (3) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as amended, have been met by the plaintiffs. As set forth in its Memorandum on Jurisdiction dated July 8, 1977, this Court has had jurisdiction of the action from its commencement on January 13, 1977.

their reason for non-disclosure their fears that reprisals would be taken by the Company.

5. Pursuant to this Court's Order of June 8, 1977, the issue before the Court is whether or not plaintiff Mead's termination was in violation of § 704(a) of Title VII and, if so, what appropriate remedies, if any, should follow therefrom.

6. Section 704(a) of Title VII, 42 U.S.C. § 2000e–3(a) provides that it is an unlawful employment practice for

> an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful practice by this [title], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this [title].

The statute provides an employee with immunity from retaliation for actions taken in connection with his or her participation in Title VII proceedings. The purpose of this protection is to promote the implementation of equal employment rights and opportunities guaranteed by Title VII and to ensure the effective implementation and maintenance of the statutory mechanisms for protection of those rights and the elimination of unlawful employment discrimination.

7. Specific evidence of intent to discriminate is not an indispensable element of proof of violation of Section 704(a). Thus, an employer's protestation that it did not intend to discriminate is unavailing where a natural consequence of its action was such discouragement toward employees from exercising their rights under Title VII. Concluding that employees' discouragement from exercising their rights will result from acts of retaliation, it is presumed that the employer intended such consequences. *Griggs v. Duke Power Co.*, 401 U.S. 424, 432, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

The parties agree that *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) is the leading case setting forth the requirements that plaintiff Mead must satisfy in order to prevail on her retaliatory discharge claim. As in all other civil litigation, the plaintiff bears the burden of proving that the employer discriminated against her in discharging her because she opposed any practice made unlawful by Title VII, or because she has made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under Title VII.[2] Once the plaintiff has established a prima facie case, the burden of proof shifts to the employer to articulate some legitimate nondiscriminatory reason for the dismissal. The burden then returns to the plaintiff who is afforded an opportunity to demonstrate that the reasons asserted by the employer were merely a cover-up or pretext for an unlawfully discriminatory decision.

Plaintiff Mead and the EEOC have successfully proven that defendant USF&G and its agents discriminated against plaintiff Mead because she filed charges of employment discrimination with the EEOC and assisted and participated in the investigations and proceedings involving those charges.[3] Adapting the four-pronged *McDonnell Douglas v. Green* test to the factual circumstances of this case, this Court concludes, first, that plaintiff Mead belongs to a class protected by Title VII. Second, plaintiff Mead is qualified for the Assistant Underwriter A position in the Fire and Marine and MultiLine Department of the Minneapolis office. She was promoted to that position by the defendants and performed her work in that position for fifteen months before a single written complaint against her work was lodged in her

---

**2.** *See also, McDonald v. Sante Fe Transportation Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976); *Naraine v. Western Electric Co.*, 507 F.2d 590, 593 (8th Cir. 1974).

**3.** The § 703(a) charges of sex discrimination are not before the Court at this time. But the law is clear that an employee is protected from retaliation under the "participation" clause of § 704(a) whether or not the charge filed with the EEOC is meritorious. *Pettway v. American Cast Iron Pipe Co.*, 411 F.2d 998 (5th Cir. 1969); *Bradford v. Sloan Paper Co.*, 383 F.Supp. 1157 (N.D.Ala.1974); *Francis v. A. T. & T.*, 55 F.R.D. 202 (D.D.C.1973); *EEOC v. Kallir, Phillips, Ross, Inc.*, 401 F.Supp. 66 (S.D.N.Y.1975).

personnel file by the defendants, after they learned of her pregnancy. Third, after the defendants learned that Ms. Mead had filed sex discrimination charges with the EEOC, they deliberately and intentionally engaged in retaliation, which culminated in the January 7, 1977, discharge, because she had filed her charge with the EEOC. The Findings of Fact speak for themselves in this regard. The main thrust of defendants' actions was to build and document a case against Ms. Mead in an attempt to make it look as if her discharge were for the legitimate, nondiscriminatory reason of poor work performance. The defendants' intentions are summed up by the handwritten memorandum of Office Manager Merz after his August 16, 1976, phone conservation with the Company's Vice President of Personnel:

> If we wish to 'fire' either or both [Ms. Oakley and Ms. Mead] we must document the moves of the two of them over a period of time. If discharge should be on the basis of non-productiveness, their output must be documented, as well as all other people in the department for comparative purposes. We must have a documented case in the event we went to court. [emphasis added].

The fourth criteria of the test of *McDonnell Douglas v. Green* has been met. There has never been an assertion by USF&G that it intended to eliminate the Assistant Underwriter A position in the Fire Department of its Minneapolis office.

The defendants attempted to justify Ms. Mead's discharge on the grounds that it was impelled by her poor work performance and personality conflicts with fellow employees. This Court concludes that both reasons were merely pretextual ones for the underlying motivation to fire Ms. Mead because she had filed the charge with the EEOC.

The evidence does not sustain the assertion that Ms. Mead did not get along with her fellow employees, although it does support the converse, that at least one of Ms. Mead's co-employees felt hostility towards her and watched only Ms. Mead and two of the other charging parties so that she could report alleged infractions to the management. The evidence further showed that Mrs. Steinart and Miss Bunting surveyed Ms. Mead and wrote reports on her conduct at the specific request of USF&G management. Otherwise, there was no evidence of personality clashes. In fact, Mr. Rowe liked Ms. Mead and Ms. Mead first established her friendship with Kathryn Fairchild in the lunchroom of USF&G.

The only reasonable inference to be drawn from the inconsistent, sometimes contradictory evidence about Ms. Mead's work performance is that the work evaluations of Ms. Mead were made after-the-fact: after the Company had notice that Ms. Mead had filed charges with the EEOC; and, as a result of that knowledge and in reaction to it, after the Company had begun to take reprisals against Ms. Mead; and after the Company had begun to consider the possibility of retaliatorily discharging Ms. Mead and had, consequently, begun to paper her file in an attempt to establish a pretextual justification for the retaliatory discharge. It defies common business sense that the Company could have maintained Ms. Mead in its employ for two years if her rate of error was 50%. The fact, among others, that Ms. Mead remained in the Company's employ until January 7, 1977, impels this Court to conclude that her work was adequate and that she was fired because she had filed her discrimination charges with the EEOC and the Minnesota Department of Human Rights.

That is the only reasonable conclusion which can be inferred from the credible evidence submitted to this Court. The second conclusion is so illogical that this Court rejects it, although it, too, would sustain the plaintiffs' claim. That illogical explanation is that Ms. Mead's work was indeed unsatisfactory from April, 1975, but that the Company maintained Ms. Mead on its workforce until January 7, 1977, when it felt that it was safe to fire her without detection, because she had filed her sex discrimination charges. One of the problems with this view is that although the allegedly poor work performance began in

the spring of 1975, there were no adverse personnel reports of Ms. Mead's work written until she became pregnant, with the number and intensity increasing substantially after she filed her charges. In effect, the Company's defense requires this Court to accept the conclusion that the Company was willing to tolerate the unsatisfactory work of an employee for at least twenty months, giving that employee over twenty months to improve, in the meantime her supervisor's time, over 50% of the worktime of another underwriter, her co-employees' time, and the Company's good will and reputation with its agents and insureds. The evidence, with the sometimes patent references to the Company strategy of building and documenting a case against Ms. Mead in order to establish a pretextual reason for discharging her, does not verify the defendants' defense.

■ 8. Moreover, in order to proceed, the plaintiffs need not show that the retaliatory discrimination was the sole or principal reason for the discharge but rather need only show that "retaliatory discrimination on the part of the employer contributed among other things to cause the discharge." *Hochstadt v. Worcester Foundation*, 545 F.2d 222 (1st Cir. 1976); *Accord, EEOC v. Kallir, Phillips, Ross, Inc., supra*, 401 F.Supp. 66, 72 and cases cited at n.17 (S.D. N.Y.1976). The Court of Appeals for the Eighth Circuit has used a similar standard in interpreting a similar provision of the National Labor Relations Act which prohibits discriminating against and discharging employees for engaging in union or other concerted protected activities. For instance, in *Singer Co. v. NLRB*, 429 F.2d 172, 179 (8th Cir. 1970) the Court noted,

> We recognize that discriminatory treatment of employees by their employer, motivated in whole or in part by their union or protected activities violates § 8(a)(3) and (1) and that "the mere existence of valid grounds for a discharge is no defense to a charge that the discharge

was unlawful, unless the discharge was predicated solely on those grounds and not by a desire to discourage union activity."[4]

This Court concludes as a matter of law that there was no valid ground for Ms. Mead's discharge. But even assuming for the sake of argument, only, that the Company had sustained its burden of establishing that Ms. Mead's work performance was poor, the plaintiffs have proven that retaliatory discrimination was the sole cause for the discharge. But for the filing of the EEOC charges, Ms. Mead would still be working at USF&G today.

■ 9. A defendant's discriminatory conduct and intent may also be inferred from circumstantial evidence. *Griggs v. Duke Power Co.*, 401 U.S. 424, 432, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); *Robinson v. Lorillard Corp.*, 444 F.2d 791 (4th Cir. 1971); *Local 189, Papermakers v. United States*, 416 F.2d 980, 996–97 (5th Cir. 1969).

Relevant indicia are similar acts of retaliation toward other charging parties including attempts to build a record and disguise a discriminatory purpose, acts of harassment and intimidation, and the timing of the discriminatory conduct.

The findings indicate that several similar acts of retaliation were taken against Amy LaVoie and Lesley Deaton after they filed charges, including monitoring, surveillance, threats and documenting their personnel files.

10. In considering the appropriate remedies which should be implemented in the case at hand, the Court has found it helpful to consider analogous older statutes by which Congress has prohibited acts of retaliation against employees who resort to statutory processes and remedies.

Section 704(a) is analogous to § 8(a)(4) of the National Labor Relations Act, 29 U.S.C. § 158(a)(4) and § 15(a)(3), 29 U.S.C. § 215(a)(3) of the Fair Labor Standards Act, wherein Congress has consistently guaran-

---

**4.** *Arbie Mineral Feed Co. v. NLRB*, 438 F.2d 940, 942 (8th Cir. 1971) (if "at least in part" motivated by engaging protected activities, discharge is unlawful); *Cupples Co., Manufacturers v. NLRB*, 106 F.2d 100, 117 (8th Cir. 1939).

teed freedom from reprisal to persons who invoke the aid of an agency, and thereby preserved the integrity of the particular administrative process which Congress has created.[5]

The Supreme Court has explained that the objective of Section 8(a)(4) of the NLRA is "to prevent the Board's channels of information from being dried up by employer intimidation of prospective complaints and witnesses." *NLRB v. Scrivener*, 405 U.S. 117, 122, 92 S.Ct. 798, 801, 31 L.Ed.2d 79 (1972). Failure to give full effect to the section would "impede resort to the Act" and thwart the Congressional design for "implementation of this country's labor policies." *Nash v. Florida Industrial Commission*, 389 U.S. 235, 239, 88 S.Ct. 362, 366, 19 L.Ed.2d 438 (1967).

Likewise, in § 704(a) of Title VII, the proscriptions of retaliation and reprisal have been provided so that an employee will not forego filing a charge out of fear that s/he may lose his or her job or suffer other reprisals from his or her employer if s/he files one.[6] The language of § 704(a) is even broader than the language of §§ 8(a)(3) and (4) of the NLRA and § 15(a)(3) of the FLSA and thus this Court concludes that Congress intended that persons who file charges with the EEOC are to be fully protected from any retaliation, both to secure the rights of the charging party and to avoid chilling the

actions of others who might sue to implement the guarantees of the Act.

In the case at hand, four employees, Ms. Deaton, Ms. LaVoie, Ms. Shapiro and Ms. Fairchild testified that they all were fearful as a result of Ms. Mead's termination. While fear is not an element of proof in a retaliation claim, it is precisely one of the end results which § 704(a) seeks to avoid.

11. This Court concludes that defendants' retaliatory conduct has had and will continue to have, unless enjoined, a chilling effect on other employees who have already sought to avail themselves, or in the future might seek to avail themselves, of rights guaranteed by Title VII. Unless defendants are enjoined from engaging in such retaliatory acts, the employees bringing the charges now pending against defendant USF&G will be reluctant to participate in the administrative and judicial processing of their charges and other employees who are aggrieved will be discouraged from exercising their Title VII rights.

12. Defendant USF&G's retaliatory conduct has undermined and inhibited plaintiff EEOC's ability to discharge its statutory duties and responsibilities of eliminating employment discrimination made unlawful by Title VII. (Certification of David W. Zugschwerdt). The public interest, as expressed in Title VII, is in the free and uninhibited exercise of civil rights guaran-

---

**5.** Section 8(a)(4) National Labor Relations Act, 29 U.S.C. § 158(a)(4) provides:

8(a) It shall be unfair labor practice for an employer:
(4) to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this chapter.

Section 15(a)(3) of the Fair Labor Standards Act, 29 U.S.C. § 215(a)(3) provides:

15(a) . . . It shall be unlawful for any person:
(3) to discharge or in any manner discriminate against an employee because such employee has filed any complaint or instituted any procedure under or related to this chapter, or has testified or is about to testify in any such proceeding or has served or is about to serve on an industry committee.

**6.** See *Mitchell v. De Mario Jewelry Co.*, 361 U.S. 288, 292, 80 S.Ct. 332, 336, 4 L.Ed.2d 323 (1960).

"[T]he value of such an [employee's efforts in filing a complaint] may pale when set against *the prospect of discharge and the total loss of wages for the indeterminate period necessary to seek and obtain reinstatement. Resort to statutory remedies might thus often take on the character of a calculated risk, with restitution of partial deficiencies in wages due for past work perhaps obtainable only at the cost of irremediable entire loss of pay for an unpredictable period. Faced with such alternatives, employees understandably might decide that matters had best be left as they are. We cannot read the Act as presenting those it sought to protect with what is little more than a Hobson's choice." Accord, NLRB v. Schill Steel Products, Inc.*, 480 F.2d 586, 594 (5th Cir. 1973); *NLRB v. J. P. Stevens and Co.*, 464 F.2d 1326, 1348 (2d Cir. 1972), *cert. denied*, 410 U.S. 926, 93 S.Ct. 1357, 35 L.Ed.2d 587.

teed and protected by that Act and in the effective performance by the EEOC of its duties under the law.

### APPROPRIATE REMEDIES

13. Section 706(g) of Title VII which outlines the scope of the court's remedial powers, reads in relevant part as follows:

If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay . . . or any other equitable relief as the court deems appropriate . . .

In its consideration of Title VII cases, the Supreme Court has consistently held that "the scope of a district court's remedial powers under Title VII is determined by the purposes of the Act." *Teamsters (T.I. M.E.—D.C.) v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396. One of the Act's purposes is "to make persons whole for injuries suffered on account of unlawful employment discrimination." *T.I.M.E.— D.C.*, 97 S.Ct. at 1869; citing *Albermarle Paper Co. v. Moody*, 422 U.S. 405, at 418, 95 S.Ct. 2362, 45 L.Ed.2d 280. In determining the specific remedies to be applied, a district court is "to fashion such relief as the particular circumstances of a case may require to effect restitution." *T.I.M.E.— D.C.*, 97 S.Ct. at 1869, citing *Franks v. Bowman*, 424 U.S. 747, at 764, 96 S.Ct. 1251, 47 L.Ed.2d 444. The Supreme Court has

further held that Congress vested the district courts with broad equitable powers in Title VII cases, "to make possible the 'fashioning of the most complete relief possible,'" and that the district courts have "'not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future.'" *T.I.M.E.—D.C.*, 97 S.Ct. at 1869, citing *Albermarle*, 422 U.S. at 421, 418, 95 S.Ct. 2362.[7]

14. *Reinstatement*. This relief is expressly provided for in the Section 706(g).

Reinstatement is a uniquely appropriate remedy for this retaliatory discharge as it restores the status quo prior to the Company's illegal action, places plaintiff Mead in the position she was in and would be in but for the unlawful retaliation, and concretely establishes that plaintiff Mead has rights under Title VII. It will help to reduce the chilling effect and fear that the retaliatory discharge of Ms. Mead has engendered in both Ms. Mead and other employees.

The fact that Ms. Mead was able to secure other employment following her discharge from USF&G does not alter her right to be offered reinstatement, but is relevant only to the amount of backpay due her. This is particularly true in these circumstances where the discharge has infringed on Ms. Mead's federally protected rights and interfered with the administrative processes established by Title VII. As the plaintiffs have contended in this case, one of the central purposes of § 704(a) is to preserve free and uninhibited access to the EEOC. To limit Ms. Mead's remedies to monetary reimbursement would be to thwart one of the central purposes of

---

7. In analyzing the remedial provisions of Title VII, the Supreme Court has relied on the Conference Committee Report which analyzed the 1972 amendments to Title VII and reaffirmed the remedial goals of § 706(g):

The provisions of this subsection are intended to give the courts wide discretion exercising their equitable powers to fashion the most complete relief possible. In dealing with the present section 706(g) the courts have stressed that the scope of relief under that section of the Act is intended to make

the victims of unlawful discrimination whole, and that the attainment of this objective rests not only upon the elimination of the particular unlawful employment practice complained of, but also requires that persons aggrieved by the consequences and effects of the unlawful employment practice be, so far as possible, restored to a position where they would have been were it not for the unlawful discrimination. 118 Cong.Rec. 7168 (1972). *Id.* at 421, 95 S.Ct. at 2373.

§ 704(a), a result which is totally unwarranted by the facts of this case.

The Supreme Court came to the same conclusion over 25 years ago when it discussed the propriety of reinstatement under the National Labor Relations Act for an employee who had obtained interim employment following his unlawful discriminatory discharge by a company:

> To be sure, reinstatement is not needed to repair the economic loss of a worker who, after discrimination, has obtained an equally profitable job. But to limit the significance of discrimination merely to questions of monetary loss to workers would thwart the central purpose of the [National Labor Relations] Act, directed as that is toward the achievement and maintenance of workers' self-organization. That there are factors other than loss of wages to a particular worker to be considered is suggested even by a meager knowledge of industrial affairs. Thus, to give only one illustration, if men were discharged who were leading efforts at organization in a plant having a low wage scale, they would not unnaturally be compelled by their economic circumstances to seek and obtain employment elsewhere at equivalent wages. In such a situation, to deny the Board power to wipe out the prior discrimination by ordering the employment of such workers would sanction a most effective way of defeating the right of self-organization. *Phelps Dodge Corp. v. NLRB,* 313 U.S. 177, 193, 61 S.Ct. 845, 852, 85 L.Ed. 1271 (1941).[8]

■ 15. *Backpay.* The Supreme Court has ruled that, absent extraordinary circumstances, backpay must be awarded victims of discrimination violative of Title VII. *Albermarle Paper Co. v. Moody, supra,* 422 U.S. at 419–422, 95 S.Ct. 2362. The Court of Appeals for the Eighth Circuit has explained the significance of this remedy: "It is the reasonably certain prospect of a backpay award that 'provide[s] the spur or catalyst which causes employers and unions to self-examine and to self-evaluate their employment practices and to endeavor to eliminate, so far as possible, the last vestiges of an unfortunate and ignominious page in this country's history.' *U. S. v. N. L. Industries, Inc.,* 479 F.2d 354, 379 (8th Cir. 1973)."

The backpay award should include all raises, bonuses, and other fringe benefits which Ms. Mead would have received absent her illegal discharge. Any interim earnings should be deducted from the total figure. 42 U.S.C. § 2000e–5(g). Furthermore, since the Company's unlawful conduct has created the necessity for this backpay judgment, any "uncertainties in determining what an employee would have earned but for the discrimination, should be resolved against the discriminating [party]." *Hairston v. McLean Trucking Co.,* 520 F.2d 226, 233 (4th Cir. 1975); *Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211, 260–261 (5th Cir. 1974).

The parties have stipulated that plaintiff Mead suffered a loss of $1,619.11 during the period from January 7, 1977, through August 1, 1977 as a result of net loss of pay, uncompensated regular work, uncompensated overtime, transportation expenses, unreimbursed medical expenses, and excess automobile insurance premiums. The parties further stipulated "that in the event the Court orders defendants to offer plaintiff Mead reinstatement and such offer is refused, additional backpay relief including loss of pay, vacation pay, pension benefits, termination pay and other fringe benefits may be awarded." The Court approves of the Stipulation.

■ 16. *Permanent Injunction.* Section 706(g) specifically gives the court the authority to "enjoin the respondent from engaging in [an] unlawful employment practice." The permanent injunction requested here imposes no undue hardship of the defendants for it simply obligates them to comply with Title VII's mandate to refrain from discriminating or interfering with any

---

**8.** The Supreme Court has repeatedly cited *Phelps Dodge* as authority for construing Section 706(g) of Title VII. *See,* e. g., *Franks v. Bowman,* 424 U.S. at 769, 96 S.Ct. 1251; *Albermarle Paper Co. v. Moody,* 422 U.S. at 419, 95 S.Ct. 2362.

employee or applicant because that person exercised his or her Title VII rights. In light of the intimidation and harassment of plaintiff as well as others, the record amply demonstrates that the protection of this Court is necessary to safeguard the civil rights of those employees and applicants. Cf., *U. S. v. N. L. Industries,* 479 F.2d 354, 375 (8th Cir. 1973). Furthermore, a permanent injunction serves to protect public interest in free and uninhibited access to the EEOC, the federal agency responsible for enforcing Title VII.

Such injunctions, in the form of cease and desist orders are routinely entered upon proof of a retaliatory discharge in violation of the National Labor Relations Act. For instance, *NLRB v. Scrivener,* 405 U.S. 117, 92 S.Ct. 798, 31 L.Ed.2d 79 (1972) involved a closely analogous fact situation in that an employee was discharged for exercising protected statutory rights of invoking access to a government agency. The remedy for that violation was a routine cease and desist order which the Court of Appeals for the Eighth Circuit enforced without comment. 80 LRRM 3005 (8th Cir. 1972).

Such injunctions are becoming common in Title VII cases. Two of the Title VII cases on record involve facts very similar to the ones at hand. In those cases the defendants were enjoined from engaging in practices which would have the effect of precluding or discouraging persons similarly situated to the plaintiffs from exercising their rights under Title VII, *EEOC v. Union Bank of Arizona,* 12 FEP 527, 530 (D.C.Ariz. 1976); *EEOC v. Midas, Inc.,* 8 FEP 719, 721 (1974). *See Willie Wells et al. v. Meyer's Bakery,* 561 F.2d 1268, 14 EPD ¶ 7651 (8th Cir. 1977); *Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211 (5th Cir. 1974).

Based upon the record in this case, the plaintiffs are entitled to a permanent injunction restraining defendants at the Minneapolis office of USF&G from engaging in any like or related retaliatory actions to those taken against Ms. Mead, including retaliatory discharge and retaliatory and selective surveillance and monitoring, and any other activities which violate § 704(a).

■ 17. *Communication of this Court's Order.* Credible employee testimony as well as the fact of Mead's discharge have established the chilling effect created solely by the illegal conduct of the Company on the exercise of employee Title VII rights. One of the most effective means of curbing that effect is to require the cause of the intimidation—the Company—to announce its cessation of its own illegal conduct. Employer communication of court directions to cease and desist from unlawful employment practices is a well used and effective remedy in labor law.[9]

This remedy has begun to be employed by district courts in Title VII cases. One district court ordered an employer that had unlawfully retaliated against two employees for filing a charge with the EEOC or for assisting persons who had done so to deliver to each of its employees a copy of the court's findings of fact, conclusions of law and order. *EEOC v. Union Bank of Arizona,* 12 FEP, at 529. In the case of *EEOC v. Midas, Inc.,* 8 FEP 719, a company was required to communicate to each employee both orally and by written statement the court's preliminary order reinstating retaliatorily discharge employees and enjoining further acts by the company.

Therefore, because the circumstances of this case warrant it, this Court will order that the defendant USF&G deliver a copy of this Order to each employee employed at the Minneapolis office at any time since May 5, 1976 and post a copy of the order at a conspicuous place on the working premises of the Minneapolis office for 60 days. This Court will further order that the highest ranking official in the Minneapolis office of USF&G read both this Order and § 704(a), 42 U.S.C. § 2000e–3(a) during

---

**9.** *See,* e. g., *NLRB v. Express Publishing Co.,* 312 U.S. 426, 438–9, 61 S.Ct. 693, 85 L.Ed. 930 (1941); *Marine Welding & Repair Works v. NLRB,* 439 F.2d 395, 399 (8th Cir. 1971); *NLRB v. Teamsters, Local 294,* 470 F.2d 57, 63 (2nd Cir. 1972); *cert. denied,* 393 U.S. 836, 89 S.Ct. 112, 21 L.Ed.2d 107; *J. P. Stevens & Co. v. NLRB,* 461 F.2d 490, 495 (4th Cir. 1972); *Texas Gulf Sulphur Co. v. NLRB,* 463 F.2d 778, 779 (5th Cir. 1972).

working hours at a meeting attended by all employees, supervisors and other management officials employed at defendant USF&G's Minneapolis office within ten (10) days of the signing date of this Order and that for the purpose of this meeting Sheila Mead shall be considered an employee and may be present, at her discretion.

 18. *Expungement.* The personnel records of Ms. Mead and any related records should be expunged of all adverse comments communicated since May 5, 1976. Expungement is necessary both to eliminate the discriminatory effects of past retaliation and to preclude any future discriminatory effects on Ms. Mead of USF&G's past acts of retaliation.

Following an appropriate motion and hearing, the Court will determine plaintiff's entitlement to costs and a reasonable attorney's fee.

### ORDER FOR PLAINTIFF MEAD'S § 704(a) RETALIATORY DISCHARGE CLAIM

Before the Court is the complaint of plaintiff Sheila Mead and the plaintiff-intervenor Equal Employment Opportunity Commission that defendant United States Fidelity and Guaranty Company learned in May, 1976, that Ms. Mead had filed charges with the EEOC alleging that USF&G unlawfully discriminated against her on the basis of sex, and that thereafter, in retaliation for filing those sex discrimination charges, the defendant USF&G through its agents took reprisals against Ms. Mead by, among other activities, monitoring her work with greater frequency than that of other similarly situated employees, making unsupported adverse reviews of her work and discharging her. This matter has been heard by this Court and Findings of Fact and Conclusions of Law have been drawn, resulting in the conclusion that the defendant USF&G did retaliate against plaintiff Sheila Mead and discharge her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–3(a) *et seq.* because she had filed charges alleging that USF&G discriminates on the basis of sex with the EEOC.

Therefore, in accordance with those Findings of Fact and Conclusions of Law, the following relief is ORDERED:

A. that defendant United States Fidelity and Guaranty Company, its officers, agents, employees, and all persons in active concert or participation with it are hereby permanently enjoined from engaging in any retaliatory actions in violation of Section 704(a) against plaintiff Sheila Mead or any other employees at its Minneapolis, Minnesota branch office for opposing practices made unlawful under Title VII or for filing charges, testifying, assisting or participating in an investigation or other proceeding under Title VII.

B. that defendant USF&G offer plaintiff Sheila Mead reinstatement to the position of Assistant Underwriter A in the Fire Department, restoring to her all rights and benefits she would have received if she had not been unlawfully discharged, including, but not limited to insurance and pension programs, as well as other compensation, terms, conditions and privileges of employment. Ms. Mead shall be allowed a reasonable time in which to respond to the offer of reinstatement.

C. that defendant USF&G pay to Ms. Sheila Mead the backpay due her from January 7, 1977, to August 1, 1977, amounting to $1,619.11, plus interest, at the rate of 6% per annum, and that defendant USF&G remedy all monetary and other losses caused by the unlawful termination of her employment.

D. that defendant USF&G transfer to Ms. Sheila Mead the bracelet which is given to employees who have been employed by USF&G for five years, which Ms. Mead would have received if she had not been unlawfully terminated.

E. that defendant USF&G take all actions necessary to place Ms. Mead in the position she would have been in had she not been unlawfully discharged, including the expungement from her personnel records and any other related records maintained or controlled by defendant USF&G all adverse

comments communicated or recorded since May 5, 1976. The expungement shall be stayed pending the completion of the litigation presently before this Court, including the resolution of charges other than the § 704(a) retaliatory discharge claim. Nevertheless, in any circumstances other than those involving the litigation, information shall be conveyed as if the expungement order had been completely effectuated.

F. that defendant USF&G, through its managing officer of the Minneapolis, Minnesota branch office, deliver to each employee employed in its Minneapolis office at any time since May 5, 1976, a copy of this Order within ten days of the filing date of this Order.

G. that the highest ranking official in the Minneapolis office of USF&G shall read this Order and § 704(a), 42 U.S.C. § 2000e–3(a) during working hours at a meeting attended by all employees, supervisors and other management officials employed at defendant USF&G's Minneapolis office within ten (10) days of the signing date of this Order and that for the purpose of this meeting Sheila Mead shall be considered an employee and may be present, at her discretion.

H. that defendant USF&G post in a conspicuous place in its Minneapolis office for a period of at least 60 days a copy of this Order with a Notice attached signed by a responsible officer of defendant USF&G advising employees of this Order and of the existence of the permanent injunction and directive that the Company is under this Court's Order to refrain from taking any retaliatory action against any employee who exercises his or her rights under Title VII.

Let Judgment be entered accordingly.

IT IS SO ORDERED.

### ORDER

Before the Court are plaintiff Sheila Mead's Motion for Temporary and Preliminary Relief and plaintiff-intervenor Equal Employment Opportunity Commission's Petition for Temporary Relief on plaintiff Mead's § 704(a) retaliatory discharge claim. Because permanent relief has been granted on the merits of plaintiff Mead's § 704(a) action, the Motion and Petition are hereby denied.

IT IS SO ORDERED.