735 F.Supp. 929 (1990)
Sherry K. McCONNELL, Plaintiff,
v.
NORANDA ALUMINUM, INC., A Delaware Corporation, Defendant.
No. S 87-0224 (C).
United States District Court, E.D. Missouri, Southeastern Division.
April 17, 1990.
*930 *931 Ronald L. Garms, Cape Girardeau, Mo., and James E. Reeves, Caruthersville, Mo., for plaintiff.
Lawrence H. Rost, New Madrid, Mo., for defendant.

MEMORANDUM
LIMBAUGH, District Judge.
Plaintiff initiated this two-count complaint in 1987 against defendant Noranda Aluminum. Plaintiff alleges in Count I that defendant subjected plaintiff to an unlawful discriminatory practice in violation of 42 U.S.C. § 2000e-2(a). In Count II plaintiff contends that defendant retaliated against her due to her protests of defendant's unlawful discriminatory practices in violation of 42 U.S.C. § 2000e-3(a). Plaintiff's claims were tried before this Court sitting without a jury on February 22. The Court, having considered the pleadings, the testimony of the witnesses, the documents in evidence and the stipulation of the parties, and being fully advised in the premises, hereby makes the following findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52.

I. FINDINGS OF FACT
Plaintiff Sherry McConnell is a female citizen of the United States who resides in New Madrid County, which is within the Eastern District of Missouri, Southeastern Division. Defendant Noranda is a Delaware Corporation, and maintains a facility in New Madrid County, Missouri. Defendant is engaged in an industry affecting *932 commerce, and has fifteen or more employees for each working day.
Defendant hired plaintiff in June 1981. Throughout the years, plaintiff was employed on and off by defendant. From June 15, 1981 to October 16, 1981, plaintiff was a clerk-typist in the metal control and primary sales departments. From October 1981 to November 30, 1982, she was a clerk typist in the engineering department. From June 30, 1983 to October 1, 1983, plaintiff was a clerk-typist in defendant's carbon operations department. From October 1, 1983 through April 3, 1985, plaintiff was a clerk-typist in the maintenance department. From April 3, 1985 to October 31, 1985, plaintiff was employed as a technical clerk.
On October 7, 1985 plaintiff married Mr. William Glenn McConnell. She notified defendant of her marriage on that date. Since at least October 7, 1985, plaintiff's husband was employed by defendant in its production bargaining unit and was a member of the United Steel Workers of America, Local 7686.
In October 1985, plaintiff, along with many other employees, was terminated from employment at Noranda as a result of a general reduction in force. Thereafter, plaintiff phoned Mr. Eisenbach, the Supervisor of Employee Training and Development, on several occasions to check on job availability. She turned down one full time position because she did not want to work nights, and she generally was not interested in the work. On March 13, 1986, plaintiff called Eisenbach again and asked to be considered for a job as a temporary clerk in the metal services department.
Plaintiff was rehired on March 13, 1986 as a temporary clerk in defendant's metal services department. She was informed that the job assignment was temporary and would end when the workload declined. During the period of time that plaintiff was employed as a temporary clerk, she called Eisenbach several times regarding full-time employment by defendant. Although she was interviewed for several full time jobs, she was not selected for any of them.
During July and August of 1986 defendant was engaged in collective bargaining negotiations with the United Steel Workers of America, Local 7686 (the "Union"), which represented the production workers at defendant's New Madrid, Missouri facility. Defendant management possessed substantial animus towards union members.
Defendant anticipated that the Union might strike the Missouri facility at the expiration of the then current collective bargaining agreement, which was August 31, 1986. Defendant decided to continue the operation of the facility during the anticipated strike using its non-union management and clerical employees.
During the last week in August, 1986, plaintiff's supervisor, Keith Gregson, decided that his metal services department would experience an immediate decrease in workload should a strike occur, and that plaintiff's temporary clerk position would not be necessary to the ongoing operation of the department during such time. Eisenbach concurred, concluding that it would not be economically justifiable to continue the temporary position in the event of a strike. Plaintiff was notified of this decision. She was also notified that should there be no strike and should the workload continue to warrant her employment, she would continue her temporary position in the metal services department.
Apparently, in the last week of August, Eisenbach told plaintiff that defendant had knowledge of her husband's union affiliation. He further stated that if there was a strike, she would not be permitted to work thereafter because "a woman's loyalties were naturally the same as her husband's."
On August 29, 1986, only three persons were employed by defendant at the Missouri facility in clerical positions which defendant classified for wage and pension reasons as "temporary." These three persons were plaintiff, Ms. Samantha Cowen, and Ms. Sharon Cowart. Ms. Cowen and Ms. Cowart indicated they did not want to work during the strike for religious reasons. Plaintiff, however, informed defendant that she was willing to and strongly *933 desired to work for defendant during any strike by the Union. With the strike inevitable, defendant terminated plaintiff on August 29, 1986. On the date of termination plaintiff again told defendant that she would like to continue working for defendant. Apparently, defendant indicated at that time that plaintiff would be considered for rehiring after the strike.
At midnight on August 31, 1986, the Union commenced a fullscale work stoppage by its members at the facility, which did not cease until October 14, 1986. During the strike, defendant continued production at the facility using all but four of the non-union workers employed by it prior to the beginning of the strike. Three of the four chose not to work. Plaintiff, however, was terminated. Plaintiff contends that defendant discharged her because she was the spouse of one of its unionized employees. Defendant claims it terminated her because her position was no longer viable in light of the strike.
While working as a temporary clerk in the metal services department, her quality of work and cooperation were only rated fair. She was considered by her supervisor to be very opinionated and she complained excessively. She liked to talk, which sometimes affected her work and frustrated her co-workers. On the date of her termination, a month before plaintiff filed her EEOC charge, Gregson completed an evaluation report on plaintiff in which he suggested plaintiff not be rehired.
On October 14, 1986 the Union ended its strike against defendant and defendant immediately returned all of the strikers to the positions they held prior to September 1, 1986. After the strike ended plaintiff never indicated to defendant that she wished to be rehired. She never called Eisenbach to express an interest in re-employment with the company. Defendant learned on October 10, 1986 that plaintiff had filed a charge of unlawful sex discrimination against it with the Equal Employment Opportunity Commission (EEOC). On March 12, 1987 plaintiff's position last held with defendant was filled by another person at the same salary and with the same work schedule. Both before and after this position was filled, defendant had several job openings that plaintiff could have filled. Plaintiff was not notified, considered, or hired for any of the available openings in clerical positions. Plaintiff, however, never once called defendant to be considered for a position or to indicate an interest in one of the positions. Defendant never heard from plaintiff after her termination.
Eisenbach stated that when Noranda hired people, it established an applicant pool consisting of new applicants and previous employees who have notified Eisenbach requesting that their old application be put into the current applicant pool. However, when an employee terminates, for whatever reason, Eisenbach reviews the most recent supervisor's evaluation from the date of termination. If that evaluation indicates "no re-hire" then the file is retired and will not be placed in the current applicant pool despite the employee's request.
On August 29, 1986, at the New Madrid facility, defendant employed a total of 1,172 persons, of which 1,102 were male and 70 were female. Defendant employed eight males in clerical positions and 46 females in clerical positions. Defendant employed 907 males and 2 females in its unionized production bargaining unit. Both of the female union production workers were married, but neither of their spouses were employed by defendant. Plaintiff was defendant's only non-union employee who was married to a union employee at defendant's facility.
On September 22, 1986, plaintiff filed a charge of sexual discrimination against defendant with the EEOC. On October 8, 1987 the EEOC issued a final determination of plaintiff's charge of discrimination against defendant. On December 14, 1987, plaintiff filed this action in this Court, Eastern District of Missouri, Southeastern Division.

II. CONCLUSIONS OF LAW
Plaintiff is a female citizen of the United States. Defendant is an employer within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b). This *934 Court has jurisdiction over Counts I and II of plaintiff's complaint pursuant to 28 U.S.C. § 1331, 42 U.S.C. § 2000e, et seq., and 28 U.S.C. § 1343.

A. DISCRIMINATION
Title VII of the Civil Rights Act of 1964 makes it an "unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment because of such individual's race, color, religion, sex or national origin." Title 42 U.S.C. § 2000e-2 also provides that it shall be an unlawful employment practice for an employer to "limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(2).
The evidentiary standards that apply when a person alleges that an employer has treated that person less favorably than others because of the person's race, color, religion, sex or national origin are well-established. In such "disparate treatment" cases, the plaintiff is required to prove defendant had a discriminatory intent or motive. First, however, the plaintiff must establish that he comes within one of the protected classes, i.e., race, color, religion, sex or national origin.
In contrast to the disparate treatment theory, under the disparate impact theory, the plaintiff need not show that the employer intended to discriminate. Instead, a plaintiff may establish a violation of Title VII by showing that a facially neutral employment practice has significant adverse effects on a protected group. Watson v. Ft. Worth Bank & Trust, 487 U.S. 977, 108 S.Ct. 2777, 2785, 101 L.Ed.2d 827 (1988). The premise of the disparate impact approach is that some employment practices, adopted without a deliberately discriminatory motive, may in operation be functionally equivalent to intentional discrimination. Id. This facially neutral employment practice may include objective job requirements, or subjective or discretionary requirements. Hill v. Seaboard Coast Line R.R. Co., 885 F.2d 804, 811 (11th Cir.1989).
In order to facilitate the logical and efficient presentation of evidence in disparate impact cases, the courts have developed a framework for the shifting allocation of burdens of proof and production. Hill, 885 F.2d at 811. First, the plaintiff has the burden of demonstrating that the defendant employed a facially neutral employment practice that had a significant discriminatory effect. Connecticut v. Teal, 457 U.S. 440, 446, 102 S.Ct. 2525, 2530, 73 L.Ed.2d 130 (1982). "Plaintiff is responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities." Watson, 108 S.Ct. at 2788.
Once the employment practice at issue has been identified, causation must be proved. Plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the termination of employees because of their membership in a protected group. Watson, 108 S.Ct. at 2789. Statistical disparities must be sufficiently substantial that they raise such an inference of causation. Id. Small or incomplete data sets, and inadequate statistical techniques, are common weaknesses that may be found in such evidence. Id. at 2790.
After plaintiff has made out a prima facie case, the employer may rebut the inference of discrimination by articulating a nondiscriminatory business justification for the employment practice. Watson, 108 S.Ct. at 2790. At this stage the employer has the burden of producing evidence of the business justification. Id. Basically, the dispositive issue is whether a challenged practice serves, in a significant way, the legitimate employment goals of the employer. Wards Cove Packing Co. v. Atonio, ___ U.S. ___, 109 S.Ct. 2115, 2125-26, 104 L.Ed.2d 733 (1989). The ultimate burden of persuasion, however, remains on the plaintiff. Id. 109 S.Ct. at 2126.
*935 Finally, if the employer meets the burden of production as to a sufficient business justification, the plaintiff may nonetheless establish discrimination by demonstrating that the proffered employment justification was insubstantial and pretextual, or by demonstrating pretext because other selection devices, without similarly undesirable discriminatory effect, would equally serve the employer's interest. Wards Cove, 109 S.Ct. at 2126.
Turning to an examination of the present case, the Court initially concludes that there is no basis upon which plaintiff can maintain a "disparate treatment" discrimination claim. Plaintiff contends that she was fired by defendant because she was married to a union man. Even if this were the sole reason plaintiff was fired, being the spouse of a union person is not a "protected" group contemplated by Title VII. Thus, plaintiff cannot maintain a Title VII claim on this basis.
Plaintiff presents two arguments for her "disparate impact" claim. First, she contends that defendant engaged in the employment practice of firing non-union spouses who were married to union people at Noranda. As spouses of union people were predominantly women, this practice had a disparate impact on women. In this case, plaintiff was the only employee fired as a result of this alleged practice, because plaintiff was the only spouse employed by Noranda who was married to a union employee.
Second, plaintiff contends defendant engaged in the facially neutral employment practice of firing temporary clerks when the union went on strike. As the clerks are predominantly women, this practice had a disparate impact on women. In this case, three temporary clerks were fired, all of whom were women.
Turning initially to plaintiff's first ground, it is clear that plaintiff has entirely failed to prove a prima facie case of disparate impact. First, plaintiff has failed to establish an employment practice on the part of defendant. If in fact defendant fired plaintiff solely because she was married to a union employee, it was not because of an employment practice that defendant did so. Defendant never had, nor is there evidence that defendant had, a policy of firing spousal employees of union members. In fact, only one other person was fired allegedly due to her relationship with a union person, which occurred several years prior to plaintiff's termination. The Court does not believe the disparate impact theory was ever intended to encompass the type of situation plaintiff presents.
Second, even if defendant did have an employment practice of firing spouses of union members, plaintiff entirely fails to establish causation. Plaintiff must offer statistical evidence to show that the practice has caused an adverse effect. The statistical disparities must be substantial to raise the inference of causation. Watson, 108 S.Ct. at 2788. Here, one woman was fired because of the alleged practice. No men were fired. This is hardly sufficient to establish a significant discriminatory effect. There simply is no evidence to support plaintiff's contention that this alleged practice has a disparate impact on women.
As for plaintiff's second ground for disparate impact, plaintiff again fails to establish a prima facie case of disparate impact. Although the firing of temporary employees during times of union strikes may be an employment practice, plaintiff fails entirely to establish causation. The statistical disparities are too insubstantial to raise the inference of causation. Watson, 108 S.Ct. at 2788. This is predominantly so because of the small amount of data with which plaintiff has to work. Id. at 2790.
As plaintiff has failed to establish a prima facie case of either disparate treatment or disparate impact, judgment will be entered in favor of defendant on Count I of plaintiff's complaint.

B. RETALIATION
Section 2000e-3(a) of Title VII makes it unlawful for an employer to discriminate against an employee because of the employee's opposition to any practice *936 made unlawful by Title VII, or because the employee has made a charge under the Act. Sisco v. J.S. Alberici, 655 F.2d 146, 150 (8th Cir.1981). The statute provides an employee with immunity from retaliation for actions in connection with his or her participation in Title VII proceedings. Mead v. U.S. Fidelity and Guaranty Co., 442 F.Supp. 114, 129 (D.Minn.1977).
A plaintiff alleging retaliation for participation in Title VII processes must show: "(1) statutorily protected participation; (2) adverse employment action; (3) a causal connection between the two." Womack v. Munson, 619 F.2d 1292, 1296 (8th Cir.1980), cert. denied, 450 U.S. 979, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981). As long as the employee had a reasonable belief that what was being opposed constituted discrimination under Title VII, the claim of retaliation does not hinge upon a showing that the employer was in fact in violation of Title VII. Sisco, 655 F.2d at 150.
Once the plaintiff has made out a prima facie case of retaliatory action, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the action. Womack, 619 F.2d at 1296. The employer need not prove the absence of retaliatory motive, but need only produce evidence that would "dispel the inference of retaliation by establishing the existence of a legitimate reason." Womack, 619 F.2d at 1296. Defendant need only show that the adverse action would have occurred even in the absence of retaliatory intent. Id.
After defendant has articulated some legitimate, nondiscriminatory reason, the burden returns to plaintiff who is afforded the opportunity to demonstrate that the defendant's asserted reasons were merely a pretext for an unlawfully discriminatory decision. Mead, 442 F.Supp. at 129. The plaintiff must prove that the engagement in the protected activity constitutes a motivating factor in the discharge. Jackson v. Mo. Pac. R. Co., 803 F.2d 401, 406-07 (8th Cir.1986). The overall burden of persuasion remains with the plaintiff throughout this entire process. Womack, 619 F.2d at 1296.
Plaintiff's basis for retaliation is that when the strike had ended and defendant began rehiring people, defendant was aware that plaintiff had filed an EEOC claim on October 22, 1986. Because of her claim, defendant allegedly refused to hire plaintiff.
Plaintiff has established the first two elements of a prima facie case for retaliation. She did engage in a statutorily protected activity when she filed her EEOC claim. Furthermore, the fact that she was not rehired after the strike ended could be considered an adverse employment decision. However, there simply is no evidence to establish a causal connection between her EEOC claim and the failure of defendant to rehire her. Thus, plaintiff has failed to establish a prima facie case of retaliation.
Assuming plaintiff did establish a prima facie case, defendant has proffered a legitimate, nondiscriminatory reason for failing to rehire her. Defendant maintains that throughout plaintiff's employment with defendant, plaintiff always initiated employment action. When she was not then currently employed by defendant, she repeatedly called Eisenbach for job consideration. When she was employed with defendant, she often called Eisenbach to consider her for other employment opportunities with Noranda. Once the strike ended in October 1986, however, plaintiff never contacted defendant for a job position. She never expressed any interest in resuming work for defendant.
Gregson, in his evaluation of plaintiff on the date of her termination, stated among other things that plaintiff's quality of work was only fair. Importantly, Gregson indicated in her file that he suggested she not be rehired.
Therefore, defendant did not rehire plaintiff (1) because she never called anyone to request her application be considered for re-employment; and (2) even had she so requested, her application would not have been reconsidered because she had a poor *937 work performance from her previous period of employment. This clearly establishes defendant's burden of articulating a legitimate, nondiscriminatory reason for not rehiring plaintiff.
The burden then shifted back to plaintiff to establish that defendant's reasons were pretextual. Plaintiff has set forth no evidence to support the conclusion that the motivating reason for defendant's failure to rehire plaintiff was her EEOC claim. Thus, plaintiff has failed to carry her ultimate burden of persuasion on her retaliation claim.
Accordingly, the Court finds that defendant Noranda did not retaliate against plaintiff in violation of 42 U.S.C. § 2000e-3(a). Judgment will be entered accordingly.