923 F.Supp. 1199 (1996)
Janet Marie HILL, Plaintiff,
v.
ST. LOUIS UNIVERSITY, Defendant.
No. 4:95CV517.
United States District Court, E.D. Missouri, Eastern Division.
April 19, 1996.
*1200 *1201 *1202 *1203 *1204 Kevin A. Nelson, Nelson and Wolff, L.L.C., St. Louis, MO, for Janet Marie Hill, plaintiff.
Teri B. Goldman, Associate, Robert J. Tomaso, Peter H. Ruger, Peter G. Yelkovac, Peper and Martin, St. Louis, MO, for St. Louis University, a Missouri Corporation, defendant.
Peter H. Ruger, Peper and Martin, St. Louis, MO, for Patrick N. Freesh, defendant, John W. Anderson, defendant.

MEMORANDUM
LIMBAUGH, District Judge.
Plaintiff has filed a first amended complaint alleging that she was discriminated against and constructively discharged from her employment on the basis of sex and age. Her claims are as follows: Count I  Title VII (sex discrimination  disparate impact); Count II  Missouri Human Rights Act (MHRA) (sex discrimination  disparate impact); Count III  Title VII (sex discrimination  disparate treatment); Count IV  MHRA (sex discrimination  disparate treatment); Count V  Age Discrimination in Employment Act claim; Count VI  MHRA (age discrimination); and Count VII  tortious interference with a noncontractual employment relationship or expectancy.[1] This matter is before the Court on the parties' cross-motions for summary judgment: defendant SLU's motion for summary judgment (#51), filed December 29, 1995 and plaintiff's motion for summary judgment (# 55), filed January 24, 1996.[2] Extensive responsive pleadings to both motions have been filed. This cause of action is set for trial on the Court's trial docket of June 10, 1996.
Courts have repeatedly recognized that summary judgment is a harsh remedy that should be granted only when the moving party has established his right to judgment with such clarity as not to give rise to controversy. New England Mut. Life Ins. Co. v. Null, 554 F.2d 896, 901 (8th Cir.1977). Summary judgment motions, however, "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." Mt. Pleasant v. Associated Elec. Coop. Inc., 838 F.2d 268, 273 (8th Cir.1988).
Pursuant to Fed.R.Civ.P. 56(c), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). The burden is on the moving party. Mt. Pleasant, 838 F.2d at 273. After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).
In passing on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. Buller v. Buechler, 706 F.2d 844, 846 (8th Cir.1983). The court is required to resolve all conflicts of evidence in favor of the nonmoving party. Robert Johnson Grain Co. v. Chem. Interchange Co., 541 F.2d 207, 210 (8th Cir.1976).

*1205 Count I  Title VII Sex Discrimination  Disparate Impact

The first issue that must be addressed is whether plaintiff's Count I  Title VII disparate impact claim of sex discrimination regarding reclassification of positions is timebarred for failure to timely file a charge of discrimination with the EEOC. Defendant SLU contends that plaintiff has failed to file, within 300 days of the occurrence of the reclassification, a proper charge with the EEOC; thus, she is precluded from pursuing this claim in federal court.[3] Plaintiff contends that she is entitled to pursue this claim in court because her "constructive discharge" (the discriminatory act upon which she did file a timely charge with the EEOC for purposes of Title VII and the ADEA) was the last discriminatory act of a "continuing violation" that began with the reclassification.
After careful review of the matter, the Court determines that the plaintiff's Count I claim is time-barred, or in the alternative, plaintiff has failed to establish a prima facie case for a disparate impact claim under Title VII.
There is no dispute that on June 9, 1994 plaintiff filed a formal charge with the EEOC alleging that she had been wrongfully terminated. She alleged that date of discrimination as only December 1, 1993 (the date she was alleged asked either to resign or be fired). She did not indicate on the charge, as provided for, that the alleged discriminatory act was a "continuing violation".
Usually the "continuing violations" theory is advanced in cases wherein the plaintiff failed to seek administrative review of allegedly discriminatory acts that preceded the acts for which administrative review was sought. It allows a court to consider alleged discriminatory conduct prior to the applicable statute of limitations period, if the plaintiff can show that the acts outside the limitations period were part of a "continuing pattern" of discrimination, and at least one of these acts of the pattern occurred within the limitations period and is the subject of a timely administrative charge.
Missouri courts have recognized the concept of continuing violations in employment discrimination cases. Roberts v. Panhandle Eastern Pipeline Co., 763 F.Supp. 1043, at 1049 (W.D.Mo.1991), citing, Missouri Pacific Railroad Co. v. Missouri Commission on Human Rights, 606 S.W.2d. 496 (Mo.App.1980). In Missouri Pacific Railroad Co., the Court held that in order to establish discrimination in the context of continuing violations, a plaintiff must show that a continual employment relationship existed during the time of the alleged discriminatory acts. Id., at 501-502. Once the employment relationship is severed, the discrimination ceases. Id., at 501. The United States Supreme Court had earlier defined the doctrine when it stated:
A discriminatory act which is not made the basis for a timely charge is ... merely an unfortunate event in history which has no legal consequences.
Respondent emphasized the fact that she has alleged a continuing violation. United's seniority system does indeed have a continuing impact on her pay and fringe benefits. But the emphasis should not be placed on mere continuity; the critical question is whether any present violation exists.
United Air Lines, Inc. v. Evans, 431 U.S. 553, 558, 97 S.Ct. 1885, 1888, 52 L.Ed.2d 571 (1977). It is then a distinction must be made between a continuing violation which the courts find actionable, and a continuing impact, which the courts have determined is not actionable. Roberts v. Panhandle Eastern Pipeline, at 1049, citing, Missouri Pacific, at 501 and United Air Lines v. Evans, 431 U.S. at 558, 97 S.Ct. at 1888.
The Eighth Circuit has provided some guidance in the application of the "continuing violations" theory, especially with regards to a statute of limitations issue. In Satz v. I.T.T. Financial Corp., 619 F.2d 738, 744 (8th Cir.1980), the Court stated:

*1206 Where ... discrimination is not limited to isolated incidents but pervades a series or pattern of events which continue to within [180] days of the filing of the charge ..., the filing is timely ... regardless of when the first discriminatory incident occurred.
Neither the Eighth Circuit nor the district courts in the circuit have elaborated as to what constitutes a "continuing pattern" of discrimination except to note that an initial job assignment does not constitute a continuing violation even if some of the effects of that assignment do not occur until later. Ashley v. Boyle's Famous Corned Beef Co., 66 F.3d 164, 167 (8th Cir.1995); Heymann v. Tetra Plastics Corp., 640 F.2d 115, 120 (8th Cir.1981). Recently, a district court in Iowa thoroughly analyzed the concept of "continuing violation". Jenkins v. Wal-Mart Stores, Inc., 910 F.Supp. 1399 (D.Iowa 1995). It found that the federal courts have consistently viewed the continuing violation doctrine in one of two ways: 1) a series of acts with one independent act occurring within the charge-filing period; or 2) the maintenance of a system or policy which discriminates. Jenkins, at 1414-15 (citations omitted).
In cases involving the "series of acts" type of continuing violation, most courts have followed the lead of the Fifth Circuit in Berry v. Board of Supervisors, 715 F.2d 971 (5th Cir. 1983) which sets forth factors to consider: 1) subject matter  relationship of the acts to each other; 2) permanence  whether the nature of the alleged violations should have "triggered an employee's awareness of the need to assert his rights and whether the consequences of the act would continue even in the absence of a continuing intent to discriminate"; and 3) frequency  whether the alleged acts are reoccurring or "more in the nature of an isolated employment decision". Jenkins, at 1415 citing Berry, at 981 (other citations omitted). The second type of continuing violation focuses on a "systematic policy of discrimination" as opposed to its application to the employee personally. Jenkins, at 1416-17.
It is not clear as to which type of continuing violation Ms. Hill advances in her attempt to defeat the issue of untimeliness. She speaks of a "continuing pretextual scheme" carried out by two supervisory personnel; yet, the entire focus of her complaint is that she alone was singled out and that actions specific to her were undertaken in order to force her to resign. There does not appear to be any "systematic policy" of SLU that plaintiff is challenging but rather a "series of acts" perpetrated against her that is the nexus of her complaint.
After reviewing the parties' pleadings, and giving consideration to the factors set forth in Berry, supra, the Court determines that plaintiff's disparate impact claim is time-barred.
The reclassification was effective July 1, 1993. It was an "isolated employment decision" which affected not only the plaintiff, but several other employees both male and female. It was an act distinct and independent of the decision to terminate plaintiff due to poor job performance. Other than the July 1, 1993 reclassification, there were no other reclassifications. Finally, plaintiff admits that at the time of the reclassification, she believed it to be discriminatory and even expressed this belief to John Anderson; yet, she did not do anything to assert her rights. Plaintiff's Deposition, pgs. 178-79. The reclassification was clearly a discrete event, similar to a denied promotion or a demotion (plaintiff herself likens the reclassification to a demotion), that triggered a duty of the plaintiff to assert her rights. Since she did not file a timely charge of discrimination based upon the July 1, 1993 reclassification, Count I is time-barred.[4]
Even if the Court were to find that plaintiff's Count I claim was not time-barred, she still has failed to establish a prima facie case of impact discrimination.
In order to establish a prima facie case of disparate impact, a plaintiff must *1207 show that a facially neutral employment practice or policy has a significant adverse impact on members of a protected class. Chambers v. Omaha Girls Club, Inc., 834 F.2d 697, 701 (8th Cir.1987); McIntosh v. Weinberger, 810 F.2d 1411, 1427 (8th Cir. 1987); Leftwich v. Harris-Stowe State College, 702 F.2d 686, 690-91 (8th Cir.1983); Hawkins v. Anheuser-Busch, Inc., 697 F.2d 810, 815 (8th Cir.1983); Webb v. Derwinski, 868 F.Supp. 1184, 1190 (E.D.Mo.1994), aff'd, 68 F.3d 479 (8th Cir.1995); McConnell v. Noranda Aluminum, 735 F.Supp. 929, 934-35 (E.D.Mo.1990). The plaintiff is not required to show intentional discrimination by the employer. S/he need only to demonstrate that a facially neutral employment practice actually operates to exclude from a favorable employment decision (i.e. a job position, a promotion, etc.) a disproportionate number of persons in a protected class. Leftwich, at 690; Hawkins, at 815; see also, Griggs v. Duke Power Co., 401 U.S. 424, 431-32, 91 S.Ct. 849, 853-54, 28 L.Ed.2d 158 (1971). It is the plaintiff's burden to demonstrate more than "a mere occurrence of isolated, accidental or sporadic discriminatory acts." Kachel v. City of Pueblo, 743 F.Supp. 749, 757 (D.Colo.1990) citing Teamsters v. U.S., 431 U.S. 324, 336 n. 16, 97 S.Ct. 1843, 1855 n. 16, 52 L.Ed.2d 396 (1977), aff'd, 945 F.2d 411 (10th Cir.1991); see also, McConnell, at 934. Statistical evidence is relevant to a showing of a "significant discriminatory impact". Leftwich, at 690; Webb, at 1190; McConnell, at 934. The statistical evidence, though, must be of the kind and degree sufficient to raise the inference that the practice in question was based upon an unlawful consideration of factors, such as age, race, or sex. Watson v. Fort Worth Bank and Trust, 487 U.S. 977, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988); Goetz v. Farm Credit Services, 927 F.2d 398, 405-06 (8th Cir.1991); McConnell, at 935. Statistical disparities must be sufficiently substantial so as to raise such an inference of causation. Goetz, at 405-06; McConnell, at 934.
Plaintiff fails to make a prima facie showing of disparate impact for three reasons. Firstly, the decision to reclassify certain student activities positions at Parks College was a "one-time" personnel decision. Plaintiff has not made any showing that the July 1, 1993 reclassification decision was one in a series of reclassification decisions. There is no evidence that the July 1, 1993 reclassification decision was part of an ongoing "practice or policy" of defendant SLU. Secondly, plaintiff has failed to make a sufficient showing that a "significant" discriminatory impact resulted from the reclassification. Plaintiff received a 2% pay increase, and no change in grade level or benefits following the reclassification. Furthermore, she concedes her duties and responsibilities remained the same. Her primary contention appears to be that the title "coordinator" has less standing in the professional community than the title "director". She goes to great length to demonstrate how she considered the reclassification to be a demotion and was so embarrassed by it that she avoids listing it on her resume. This argument demonstrates why plaintiff fails to establish the third element of a prima facie case of disparate impact. Plaintiff makes no showing that the reclassification had a "significant discriminatory impact" on women as a protected class. Her entire summary judgment motion and response to the defendant's summary judgment motion on this matter only argues that the reclassification had adverse effects on her alone. How she was "singled out"; how the reclassification was "deliberate and directed at [plaintiff]; and how the reclassification was part of a "pretextual scheme" to "eliminate [plaintiff] from employment." Plaintiff's responsive pleading, pgs. 8, 12, and 14. She offers no statistical evidence to support her claim of disparate impact on women. The extent of the plaintiff's support is her own subjective allegations of the harm perpetrated on her. She sums up her argument as follows:
"The reclassification was a materially adverse employment action by Defendant St. Louis University against Ms. Hill. Her position was reclassified to include unreal job expectations; it was a demotion to an entry level position that affected her ability to secure other employment, and she suffered financially vis-a-vis the male staff."
*1208 Plaintiff's Memorandum in Support of Plaintiff's Motion for Summary Judgment, pg. 8 (emphasis added) (citation omitted). Clearly, plaintiff has failed to make a prima facie case of disparate impact on women as regards the reclassification of July 1, 1993. See, Webb, at 1190; McConnell, at 935. Summary judgment will be granted to the defendant as to Count I of the plaintiff's amended complaint.

Counts III (Title VII Sex Discrimination  Disparate Treatment) and V (ADEA  Disparate Treatment)
Plaintiff contends that she was subjected to different treatment from that of her younger and male counterparts. She argues that her supervisors (Anderson and Lunning) "abdicated their responsibility for job performance standards [to plaintiff]", failed to "establish specific job expectations in violation of St. Louis University policy", failed to "inform[ed] Ms. Hill that she was not meeting her monthly or quarterly goals and objectives", conducted "falsified and procedurally defective job performance evaluations", "falsely over-documented plaintiff's alleged job performance deficiencies and under-documented her peer's performance", "testified falsely regarding performance appraisals conducted on other staff members", "testified falsely regarding budget support of the plaintiff versus her peers", and "testified falsely regarding the selection process involving plaintiff's less-qualified preferred successor".[5] Plaintiff's Motion for Summary Judgment and Memorandum in Support. Defendant counters that plaintiff has failed to establish a prima facie case of sex or age discrimination because she was not qualified for her position by virtue of the complaints received from faculty, staff, and students; or in the alternative; even if she has established a prima facie case of sex or age discrimination, she has failed to demonstrate discriminatory intent on the part of defendant SLU.
McDonnell Douglas v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) established a three-part analysis for disparate treatment cases. This analysis is equally applicable to both Title VII and the ADEA. Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir.1995). Under McDonnell Douglas, a Title VII plaintiff must first establish a prima facie case of intentional discrimination by a preponderance of the evidence. If the plaintiff successfully establishes a prima facie case of intentional discrimination, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the challenged employment action. If the defendant employer meets this burden of production, the plaintiff employee must show by a preponderance of evidence that the articulated reason(s) for the challenged employment action are pretextual and that the illegitimate criterion was the motivating reason. At all times the plaintiff employee possesses the ultimate burden of proving to the Court that s/he was the victim of intentional discrimination. Krenik, at 957-58; St. Mary's Honor Center v. Hicks, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); Favors v. Fisher, 13 F.3d 1235, 1237-38 (8th Cir.1994); Webb v. Missouri Pacific R. Co., 826 F.Supp. 1192, 1211 (E.D.Ark.1993).
In establishing a prima facie case of intentional discrimination, Hill must produce sufficient evidence to support an inference that she was subjected to an adverse employment action for discriminatory reasons. Williams v. Ford Motor Co., 14 F.3d 1305, 1308 (8th Cir.1994); Favors v. Fisher, 13 F.3d 1235, 1237 (8th Cir.1994). The threshold of proof required in establishing a prima facie case is "minimal". Johnson v. Arkansas State Police, 10 F.3d 547, 551 (8th Cir.1993). "The elements necessary to establish a prima facie case vary according to the circumstances of the alleged discrimination." Favors v. Fisher, at 1237 quoting *1209 Jones v. Frank, 973 F.2d 673, 676 (8th Cir. 1992); see also Williams v. Ford Motor Co., at 1308.
To establish a prima facie case of disparate treatment under either Title VII or the ADEA, plaintiff must demonstrate that she was 1) a member of a protected class; 2) was qualified for her position; 3) was subject to an adverse employment action; and 4) was replaced by a person with comparable qualifications. In Title VII cases of disparate treatment on the basis of gender, the plaintiff meets the fourth element by showing that the employer hired a man for the position. Krenik v. County of LeSueur, at 958.[6]
Plaintiff contends that she has established a prima facie case for both gender and age discrimination. Defendant SLU argues that plaintiff has failed to establish the second element; i.e. that she was qualified for the position she held when she left her employment.
Before addressing the dispute as to the second element of plaintiff's prima facie case for gender and age discrimination, the Court believes it is necessary to briefly address the third and fourth elements, especially as regards her claim of gender discrimination.
Plaintiff's claims, both under Title VII and the ADEA, are a bit convoluted but it appears that she believes she was subject to different job performance standards, expectations, and goals than that of her younger and male counterparts, and that her resignation was actually a "constructive discharge". Consequently, plaintiff's claims consist of two parts: 1) discriminatory treatment while on the job; and 2) constructive discharge. She contends that the adverse employment action she suffered was being "constructively discharged" from her employment.
There is no dispute that plaintiff tendered her resignation on December 3, 1993 after being given a choice, on December 1st, between resignation or termination due to poor job performance. The question is whether, under the circumstances of this case, plaintiff's resignation was in effect a "constructive discharge".
A constructive discharge "occurs when an employer intentionally renders working conditions so intolerable that an employee is essentially forced to leave the employment." Bradford v. Norfolk Southern Corp., 54 F.3d 1412, 1420 (8th Cir.1995) (citations omitted). "Work conditions are deemed intolerable if a reasonable employee would find them as such." Bradford, at 1420 citing Maney v. Brinkley Mun. Waterworks & Sewer Dept., 802 F.2d 1073, 1075 (8th Cir.1986). "A choice between separation `or continuing to work under intolerable conditions' may give rise to a claim of constructive discharge." Bradford, at 1420.
Plaintiff has provided no evidence that her working conditions were so "intolerable" that she was forced to leave her employment. She has presented no evidence that she complained of her working conditions or of her treatment by co-workers or her supervisors. The only basis for her claim of constructive discharge is that on December 1, 1993 she was told that unless she resigned, she would be terminated. Plaintiff offers no legal support for her contention that notice of termination and choosing to resign instead is a "constructive discharge". It is clear that it was not her working conditions that "forced" plaintiff to resign, but rather being informed that she was being terminated from her employment. Consequently, merely being informed of termination cannot constitute a "constructive discharge".
The problem is that plaintiff confuses her "evidence" of discriminatory treatment to show pretext with her allegations of "harassment" leading up to a constructive discharge. Yet, at her deposition, plaintiff clearly stated that her lawsuit was not about *1210 sexual harassment. Plaintiff's Deposition, pg. 230 (Vol. I). Therefore, the Court concludes that this case is about plaintiff's belief that she was wrongfully terminated (despite the fact that she actually resigned). Since the defendant does not question the nature of the "adverse employment action" suffered by the plaintiff, and since it is clear that plaintiff was presented with the Hobson's choice of termination or resignation, the Court finds that plaintiff was subjected to an adverse employment action sufficient to meet the requirement of the third element of the McDonnell Douglas prima facie case.
The next problem is that plaintiff incorrectly identifies the fourth element of her prima facie case of gender discrimination as being "the defendant advertised the availability of her former position." Plaintiff's Memorandum in Support of Motion for Summary Judgment (# 55), pg. 15. This would be a proper description of the fourth element if this were a case of failure to hire; i.e. plaintiff was rejected for a position, and the position remained open and defendant continued to seek applicants with comparable qualifications, ultimately hiring a man. See, Krenik, at 958; Kobrin v. University of Minn., 34 F.3d 698, 702 (8th Cir.1994). That is not the case here. Plaintiff was terminated from her position and in order to establish a logical connection between the fourth element and the alleged illegal discrimination (in this case, gender discrimination) plaintiff must show that a man was hired to replace her in the same position with comparable qualifications.
There is nothing before the Court which indicates who was eventually hired to replace the plaintiff. Plaintiff's allegations and evidence regarding SLU's actions in attempting to replace her only refer to advertisements in general for her position and two interviews with a younger male, Chris Kroeger. However, it is undisputed that although offered the position, Mr. Kroeger did not accept it. Since the defendant does not take issue with plaintiff's incorrect statement of the fourth element of her sex discrimination prima facie case or whether she has met the properly stated fourth element, the Court will accept, without deciding the merits of the issue, that plaintiff has satisfied the fourth element for a Title VII sex discrimination prima facie case.
Defendant contends that plaintiff has failed to establish the second element of a prima facie case of sex or age discrimination because plaintiff was not "qualified" for the position she held at the time of her termination. Defendant contends that job performance concerns were raised consistently with the plaintiff, dating back to 1991, involving complaints from students, faculty, alumni, and staff. Plaintiff simply argues that she has satisfied the second element because her education and experience meet the applicable criteria for the job.
In making a prima facie case of discriminatory discharge (Title VII or ADEA), the second element regarding "qualification" entails more than simply having met the requisite educational and experiential criteria for the position. It means that the plaintiff must have been performing her job "at a level meeting her employer's legitimate expectations." Cram v. Lamson & Sessions Co., 49 F.3d 466, 472 n. 7 (8th Cir. 1995); Johnson v. Group Health Plan, Inc., 994 F.2d 543, 546 (8th Cir.1993). In the past, evidence of a plaintiff's poor work performance alone was deemed sufficient to show that a plaintiff was not "qualified" for the job; thus, the second element of a plaintiff's prima facie case of discriminatory discharge had not been satisfied. Richmond v. Board of Regents of Univ. of Minn., 957 F.2d 595, 598-99 (8th Cir.1992). Recently, however, the Eighth Circuit has expanded upon the concept of what is entailed in meeting the second element when the issue is one of "qualification". In Gill v. Reorganized Sch. Dist. R-6 Festus, Mo., 32 F.3d 376 (8th Cir.1994) the defendant employer attempted to show that the plaintiff had not met the district's legitimate expectations for a substitute teacher's performance by producing evidence of plaintiff's alleged misconduct while on the job. The Court found that the district court had "prematurely focused on the alleged misconduct that triggered the adverse employment decision." Gill, at 378. The Court found that in establishing her prima facie case, the plaintiff "was not required to disprove the reason given for her discharge." *1211 Gill, at 378. The Court held that "[a]t the prima facie stage, Gill only needed to prove that `[she] was doing [her] job well enough to rule out the possibility that [she] was fired for inadequate job performance.'" Gill, at 378 quoting Crimm v. Missouri Pac. R. Co., 750 F.2d 703, 711 (8th Cir.1984); see also, Davenport v. Riverview Gardens Sch. Dist., 30 F.3d 940, 943 (8th Cir.1994). In the Gill case, the Court found that the plaintiff's denial of the accusation of misconduct (plaintiff allegedly called a student an offensive racial name) and evidence of the plaintiff's satisfactory performance as a substitute teacher otherwise was sufficient to establish the job performance element of her prima facie case. Gill, at 378.
In the instant case, the record is well-documented by the defendant as to instances of the defendant's dissatisfaction with certain aspects of the plaintiff's job performance, based in some part on complaints made by students, alumni, faculty, or staff. However, plaintiff has also submitted evidence showing that she was performing her job to a minimal degree of satisfaction of her supervisors. At this juncture, plaintiff does not have to disprove the instances of poor job performance, simply put forth enough evidence to show that she was "qualified" for her job. Since there is no dispute that she had the requisite education and experience for the job, and that she was minimally performing the tasks required of the job, the Court finds that she had established the performance element of her prima facie case of discriminatory discharge.
Defendant next contends that even if plaintiff has established a prima facie case of discriminatory discharge on the basis of sex or age, SLU had legitimate nondiscriminatory reasons to discharge plaintiff.
Defendant contends that plaintiff was terminated (i.e. requested her resignation) for poor job performance. It has proffered extensive documentation and deposition testimony supporting SLU's supervisors' belief that plaintiff was not carrying out her job effectively and to the level expected by her supervisors. The stated job deficiencies included but were not limited to: 1) failure to complete tasks and assignments; 2) complaints from prospective employers, administrators, students, faculty, and staff; 3) repeated cancellation of career development workshops; 4) failure to develop internship and cooperative education opportunities; and 5) failure to timely post job vacancies from employers. The defendant's identification of these job deficiencies sufficiently set forth legitimate, nondiscriminatory reasons for the plaintiff's dismissal.
Plaintiff has offered a plethora of documents and an abundance of affidavits to support her contention that she was not "guilty" of the deficiencies cited by the defendant. She argues extensively in her briefs that her former supervisors (Anderson and Lunning) are liars and that their testimony is not credible. She goes to great lengths to criticize them for their "supervisory deficiencies" and for failing to precisely tell her how to perform her job; i.e. how many co-op or internship programs to establish, how may employer contacts to be made, how many students she was to assist, how many career fairs to sponsor, how many job announcements to post, etc. She does not deny the existence of the written complaints forwarded to her supervisors regarding her job deficiencies; only arguing that she either rectified the situation or there were "extenuating circumstances". She asserts that other employees were not subjected to criticisms as often as she was. She asserts that only her budget was reduced, whereas the budgets of her male and younger peers were either increased or held constant. Although she is highly critical of her supervisors' failure to tell her specifically how to do her job[7] and for "over-documenting" her alleged job performance deficiencies; she also criticizes them for their "laissez-faire approach to personnel *1212 supervision". She faults them for "under-documenting" job deficiencies in her peers' files.
Essentially, plaintiff's entire response to the defendant's motion for summary judgment and her own summary judgment motion is a diatribe on the integrity and honesty of Mr. Anderson and Ms. Lunning.[8] She contends that Anderson and Lunning should have talked with her about the various complaints and checked out the validity of the complaints instead of writing up reprimands. Since she believes that none of the complaints regarding her job performance are valid, then Anderson and Freesh's decision to terminate her employment must be discriminatory. Essentially, she argues that the defendant's reasons are pretextual and by inference and supposition, a jury will find discrimination. This is not sufficient to sustain her burden under Hicks.
In St. Mary's Honor Center v. Hicks, supra, the Supreme Court clearly found that the burden of persuasion remains with a plaintiff in an employment discrimination case, and the plaintiff must produce evidence which not only shows that the proffered reasons for the challenged employment action are pretextual but also that the adverse employment action was motivated by an illegitimate criterion (in this case, age and gender). Hicks, at 513-15, 113 S.Ct. at 2751-52. This burden exists in a summary judgment review; i.e. plaintiff must produce evidence that supports an inference that defendant's decision was intentional discrimination based upon an illegal motivation. See, Banks v. City of Independence, 21 F.3d 809, 810 (8th Cir.1994). In other words, Hill must produce evidence which establishes a genuine issue of material fact with respect to the discriminatory intent on the part of SLU. This she has not done.
Plaintiff's criticism of Mr. Anderson and Ms. Lunning's performance and effectiveness as her supervisors is not the issue here. This Court does not sit in judgment as to whether these individuals were good supervisors. Neither Title VII or the ADEA entitle this Court to "sit as a super-personnel department that reexamines an entity's business decisions." Ruby v. Springfield R-12 Public School District, 76 F.3d 909, 912, n. 7 (8th Cir.1996); Krenik, at 960 (citations omitted). Whether plaintiff did or did not engage in the job performance deficiencies reported to her supervisors or whether she believes her supervisors should have interrogated each complainant as to the validity of the complaint is "irrelevant because [this evidence] merely questions the soundness of the [supervisors' decision]". *1213 Gill, at 379 citing Davenport, at 944. The Court is not permitted to second-guess the plaintiff's supervisors or correct a bad business decision if the decision was based on non-discriminatory reasons.
The only evidence submitted by the plaintiff which remotely addresses the issue of intentional discrimination is her contention that her budget was decreased whereas the budgets of her male and younger counterparts was increased; and that her male peers were not disciplined to the same extent that she was, i.e., asked to resign. Having carefully reviewed the record before the Court, the Court finds that the plaintiff has failed to establish that any genuine issue of material fact that the reasons proffered for her dismissal were a cover-up for intentional discrimination based on age and/or gender.
Plaintiff contends that her budget was cut while the budgets of two male peers was increased and budgets of younger peers were either increased or held constant. The submitted documents belie this contention. Although Ms. Hill's budget was cut $500.00, this cut was in the area of domestic travel and supplies, materials, and advertising. All other areas of her budget, including student labor and staffing, increased. During the relevant time-period, Ms. Lunning's budget increased and Ms. Klein's (Coordinator-Student Counseling) budget remained unchanged. Both of these employees were over the age of 40. The budget of Ms. Whitton (Director of Student Affairs) also remained unchanged. Ms. Whitton was the oldest employee in Student Affairs during this relevant time-period. Mr. Buck (Director-Resident Life) and Mr. Kurfman's (Director-Athletic Programs) budgets were increased due to the increased number of students involved in on-campus housing and athletic programs. Other than merely pointing out that these two budgets were increased, plaintiff provides no evidence that the increases were discriminatory; i.e. not substantiated by increased costs related to housing needs and athletic programs. She offers nothing upon which a reasonable jury could infer discrimination.
She next contends that other employees were not as "documented" as she was with regard to job deficiencies. In order to demonstrate disparate treatment, plaintiff must show that other "similarly situated" employees outside her protected class were not subject to the same challenged employment action. See, Jones v. Frank, 973 F.2d 673 (8th Cir.1992). In determining whether employees are "similarly situated", the Court should consider whether the employees are subject to the same conditions or accused of the same or similar conduct, yet are disciplined in different ways or subject to a different action. See, Williams v. Ford Motor Co., 14 F.3d 1305 (8th Cir.1994).
Plaintiff concedes that her position was not comparable to any other coordinator or director's position of the Student Affairs Division at Parks College. Plaintiff's Deposition, pgs. 160-163. She testified that she believed she had more responsibilities and duties than the other directors or coordinators because she provided services to a larger number of people and routinely worked with numerous people in order to provide these services. Plaintiff's Deposition, pgs. 160-63. By plaintiff's own account, the only similarity between herself and her employee-peers were the fact that they were all supervised by Mr. Anderson. However, these same employees were also supervised by Ms. Lunning.
Furthermore, plaintiff has failed to demonstrate that her employee-peers, whether male or younger, were the recipients of complaints from students, staff, alumni, and faculty as was the plaintiff. She has adduced no evidence that persons outside the Student Affairs department registered complaints with Anderson or Lunning about plaintiff's employee-peers and that such complaints were ignored or overlooked. Plaintiff complains that her performance problems were "over-documented" while the performance deficiencies of her employee-peers were "under-documented". The Court cannot fathom exactly what standard plaintiff utilizes in determining the correct number of documents that should be in an employee's file. What is relevant is not the number of memoranda documenting performance problems, but rather if performance problems were documented. Plaintiff has not shown that other male or younger employee-peers had known performance problems or complaints that *1214 were not documented in their files. The only specific employee-peer plaintiff identifies as an example of disparate treatment is Mr. Buck. Evidently, Mr. Buck was reprimanded for his handling of travel requisitions and warned that future problems would result in his termination from employment. Plaintiff's contention that Mr. Buck was treated differently is based upon two things: 1) Anderson testified at his deposition that he wrote Buck five (5) memos regarding travel voucher inconsistencies but could not locate these memos in Buck's personnel file; and 2) Buck was given nine (9) months to improve his performance whereas plaintiff was given only two (2) months. As to Anderson's deposition testimony, plaintiff's connection of Anderson's inability to immediately locate these memoranda to intentional discrimination is based upon nothing more than speculation and conjecture. Plaintiff clearly speculates that Anderson cannot locate the written reprimands because "he never wrote these memos, or Defendant St. Louis University is withholding documents from Plaintiff. The inference to be drawn is that Defendant Anderson never wrote the memos and testified falsely that he had done so." Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment (# 55), pg. 31. Plaintiff has not offered one shred of evidence to support her allegation that the reprimands were not written (e.g. Buck's affidavit or deposition testimony averring that he was never reprimanded for the travel voucher inconsistencies) or that SLU has engaged in discovery abuse by withholding requested documents. Such gross conjectures are professionally inappropriate and fail to support plaintiff's burden that SLU's reasons for termination were a pretext for age and sex discrimination. As to her allegation that Mr. Buck was given more time to improve his performance and is still employed by SLU due to favorable treatment, the deposition testimony of Anderson clearly shows that Mr. Buck resigned his position at the request of Mr. Anderson due to job performance deficiencies. Anderson Deposition, pgs. 432-33. Furthermore, plaintiff fails to show that other than the problems with travel vouchers, Mr. Buck had other job performance deficiencies to the extent as did plaintiff. Plaintiff fails to show that there were complaints by individuals outside the Student Affairs department regarding Mr. Buck as there had been regarding plaintiff.[9] Consequently, plaintiff fails to provide sufficient evidence to allow any reasonable jury to find that plaintiff was treated differently from similarly situated male or younger employee-peers.
Finally, plaintiff contends that she has shown pretext because defendant offered a less-qualified younger male her position. She claims that Anderson lied about not speaking with Chris Kroeger until February 1994 and that Mr. Anderson told Kroeger that he wanted "fresh blood" in the Career Center Coordinator position. This she believes proves intentional discrimination. The Court disagrees.
Although Mr. Anderson first testified that he did not speak with Kroeger until February 1994, he did correct himself when reminded of his notation on his December 1993 calendar.[10] All this shows is that Anderson *1215 believed he had not spoken with Kroeger until February 1994 which was when a formal interview with Kroeger took place. Even if Anderson did speak with Kroeger in December 1993, plaintiff's own evidence shows that this conversation did not take place until December 10, 1993, well after plaintiff's notice of termination on December 1st and her submitted resignation on December 3rd. Mr. Kroeger has submitted two affidavits. Plaintiff's Exhibit 63 and Defendant's Exhibit F. He attests that he first contacted Freesh in early December 1993 about a job opening in the Career Center at Parks; and that Freesh told him he would have to apply through the Human Resources Office of SLU. Kroeger further attests that he contacted Anderson to discuss the Parks College Career Center Coordinator position at some point in December 1993; and again spoke with Anderson in February 1994 when he was interviewed for the position. He attests that, either at his December 1993 meeting or February 1994 meeting with Anderson, "Mr. Anderson told me that there was a need for new blood or fresh blood in the Career Center Coordinator position at Parks College in order to improve service for students, to computerize the office more effectively, and to bring more engineering employers to Parks College." Kroeger Affidavit (dated January 26, 1996), Defendant's Exhibit F. He attests that he submitted his formal application and resume for the position of Career Center Coordinator at Parks College to the Human Resources Office of SLU on January 14, 1994. Finally, Kroeger attests that he was offered the position of Career Center Coordinator by Ms. Leslye Ellison, Director of Career Services at SLU but declined; that he was later offered the same position with the title of Assistant Director by Ms. Ellison, but that he declined again. Kroeger Affidavit (dated January 17, 1996), Plaintiff's Exhibit 63.
Firstly, plaintiff fails to offer any evidence demonstrating that Anderson's remark regarding "fresh or new blood" was anything more than a single stray remark by Anderson. This remark was undeniably made after plaintiff's termination and in and of itself states nothing suggestive of age or sex discrimination. No reasonable juror could conclude, as plaintiff does, that this comment reflects Anderson's opinion that plaintiff was too old for her job or that a man was better suited for her job. The comment is simply too vague to create a reasonable inference of age or gender discrimination. Frieze v. Boatmen's Bank of Belton, 950 F.2d 538, 542 (8th Cir.1991). Viewing the evidence in a light most favorable to plaintiff, this Court must conclude that Anderson's remark was nothing more than an isolated stray remark too vague to demonstrate a discriminatory attitude. Ruby, at 912; Stacks v. Southwestern Bell Yellow Pages, Inc., 27 F.3d 1316, 1324 (8th Cir.1994); Radabaugh v. Zip Feed Mills, Inc., 997 F.2d 444, 449 (8th Cir.1993); Frieze, supra; Beshears v. Asbill, 930 F.2d 1348, 1350 (8th Cir. 1991).
Finally, the plaintiff has failed to present any evidence which demonstrates that Mr. Kroeger was "less-qualified" than plaintiff to occupy the position of Career Center Coordinator. His undisputed cover letter and resume (as sent to the Human Resources Office of SLU) indicate that he possessed the education and experience for the position. He had over eight (8) years experience in career services programs at two local universities, extensive prospective employer contacts, established computer skills, and teaching experience. He had successfully increased student job placement at both universities. Once again, viewing the *1216 evidence in a light most favorable to the plaintiff, no reasonable juror could conclude that Mr. Kroeger was not as qualified or less qualified than plaintiff for the plaintiff's former position.
It is not for this Court to adjudge the "correctness" of the defendant's decision to terminate the plaintiff's employment. An employer has the right to make a business decision regarding its employees as it sees fit, absent intentional discrimination. "There is no principle of law that requires that a business' decision be popular with employees. As long as the decision is not based on unlawful [age] discrimination, `the courts have no business telling [companies] ... how to make personnel decisions, which may be objectively or subjectively based.'" Walker v. A.T. & T. Technologies, 995 F.2d 846, 850 (8th Cir.1993) quoting Neufeld v. Searle Laboratories, 884 F.2d 335, 340 (8th Cir.1989); see also McLaughlin v. Esselte Pendaflex Corp., 50 F.3d 507, 512 (8th Cir.1995); Bradford v. Norfolk Southern Corp., 54 F.3d 1412, 1421 (8th Cir.1995) citing Jorgensen v. Modern Woodmen of America, 761 F.2d 502, 505 (8th Cir.1985) ("The ADEA is not intended to be used as a means of reviewing the propriety of a business decision ..."); Lidge-Myrtil v. Deere & Co., 49 F.3d 1308, 1311 (8th Cir.1995). To survive summary judgment at the third stage of the McDonnell Douglas analysis, plaintiff must make a sufficient evidentiary showing that the defendant's proffered reason is pretext and that the real reason for its action is intentional discrimination based on age and/or sex. Hazen Paper Co. v. Biggins, 507 U.S. 604, 609-11, 113 S.Ct. 1701, 1706-07, 123 L.Ed.2d 338 (1993); St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993). Plaintiff has failed to do this. Instead, she offers only "inferences to be drawn", "logical conclusions", and unsupported allegations of "falsification". This is not sufficient evidence upon which a jury can rely to find that the defendant's proffered reasons for termination are a pretext for age and/or sex discrimination.
The Court has no doubt that Ms. Hill was a competent employee who performed her job to the best of her ability. However, as an "at-will" employee, SLU could terminate her employment for no reason or any reason, as long as the reason did not reflect a discriminatory animus. It is clear that plaintiff disagrees with the nature and substance of her supervisors' criticisms; however, it is not up to this Court to determine whether or not such criticisms were warranted. This Court does not "sit to determine if this reason[s] is based on sound principles of business judgment." Lidge-Myrtil, at 1312. This Court's only inquiry is whether defendant's decision was based improperly on age and/or gender. Having reviewed the record presented, the Court finds that plaintiff is unable to provide sufficient evidence to adduce a genuine issue of material fact with respect to her "ultimate burden of proving discriminatory intent." Lidge-Myrtil, at 1312 citing Marzec v. Marsh, 990 F.2d 393, 395 (8th Cir.1993).
Plaintiff is not entitled to summary judgment because she has failed to meet her third stage McDonnell Douglas burden by providing sufficient evidence for a reasonable jury to conclude that defendant's proffered reasons for termination were a pretext for age and/or gender discrimination. Defendant is entitled to summary judgment because it has established that no genuine issue of material fact exists regarding that its proffered reasons for termination were not a pretext for age and/or gender discrimination.
NOTES
[1] Counts II, IV, VI, and VII of the plaintiff's amended complaint have been dismissed (as well as co-defendants Freesh and Anderson) by previous court orders.
[2] As a result of the Court's prior orders, the instant motions will be reviewed only as they impact upon Counts I, III, and V.
[3] Since Missouri is a "deferral state", the EEOC's administrative filing deadline for Title VII and ADEA claims is 300 days of date of alleged discriminatory act. Defendant contends that since the reclassification of positions took place on July 1, 1993, plaintiff's EEOC charge of June 9, 1994 is beyond the 300 days deadline.
[4] Plaintiff does not advance an argument for the equitable tolling of the filing deadline for an EEOC charge regarding the alleged discriminatory reclassification. Even so, such an argument would be meritless. The issue is not the timeliness of the EEOC charge that was filed (i.e. the charge regarding the alleged discriminatory "constructive discharge"), but rather, the failure to file any charge which relates back to the date of the reclassification.
[5] Plaintiff also raises points regarding Anderson's "false testimony" regarding alleged action taken after plaintiff's resignation; St. Louis University's alleged "false response" to the EEOC investigation; and St. Louis University's "pretextual readvertisement" of plaintiff's position six (6) months after she had resigned. All of these points refer to alleged acts taken after plaintiff's resignation; thus, are irrelevant to the issue of discriminatory treatment leading up to her resignation (which is the discriminatory event upon which she has filed her lawsuit). These arguments are meritless.
[6] Until very recently, in an ADEA case, a plaintiff met the fourth element of a prima facie case by showing that a person outside of the protected class was given preferential treatment (i.e. promoted or hired to replace the plaintiff). However, on April 1, 1996 the United States Supreme Court held that the fourth element of replacement by a person outside of the protected class was not a proper element of the McDonnell Douglas prima facie case. O'Connor v. Consolidated Coin Caterers Corp., ___ U.S. ___, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996).
[7] The Court finds this point interesting because of the contradictions demonstrated by the record. Plaintiff faults her supervisors for failing to set out the specifics of her job; yet in the approved classification recommendation memo for the Career Center Coordinator, plaintiff herself extensively explains the main purpose of her job, its duties and responsibilities, its job requirements, its supervision requirements, its budget requirements, and other facets of the position. Plaintiff's Exhibit 2.
[8] Plaintiff also goes to great lengths to attack Mr. Anderson's character and allude that he, as a supervisor, set a poor example. She is particularly perturbed that she was given a reprimand for failing to return a school van on time. The record shows that she was reprimanded because she failed to return the school van as scheduled, which caused great difficulties for other individuals who had need of the van. She contends that she retained the van because her own car had a flat tire and faults Anderson for not taking this into consideration. However, the reprimand was clearly in response to a letter of complaint received by Anderson from the motor pool regarding the incident and Anderson testified that if plaintiff's "extenuating circumstances" had been made known at the time, she would not have been reprimanded. The fact is she was reprimanded for personal use of the van in that she failed to notify anyone that she would be using the van longer than anticipated because of her car trouble. Despite the record being very clear on this matter, plaintiff calls Anderson's criticism of her handling of the matter as "hypocrisy at its worst" and chastises Anderson over an incident involving lunch at a local restaurant.

"He authorized use of the van to take his staff to Hooter's Restaurant at Union Station to celebrate his 40th birthday. He apparently believes that it is proper to subject a 51 year-old single female to attempt to replace a flat tire alone at midnight on a deserted college campus while at the same time authorizing celebration of his birthday at a restaurant whose waitresses' skimpy attire and sexually suggestive deportment are hardly consistent with the image of a Catholic, Jesuit-run institution."
Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment (# 55), pgs. 25-26. The record indicates that this "birthday celebration" was prearranged by Anderson's staff and plaintiff offers no evidence that he arranged the party and personally authorized use of the van. Furthermore, it is not for the Court to pass judgment as to Mr. Anderson's choice of restaurants. Plaintiff's personal viewpoint of Hooter's Restaurant's business practices and whether it is an appropriate choice for a staff outing is not the type of evidence the courts have considered in adjudging discriminatory treatment.
[9] Plaintiff appears to argue that students at SLU complain about a variety of things yet only plaintiff was terminated as the result of student complaints. Plaintiff cites to the deposition testimony of Anderson and Lunning regarding the nature of student complaints and the usual responses to such complaints. The Court fails to see how plaintiff's evidence that students complain about virtually everything under the sun demonstrates intentional discrimination by SLU. Plaintiff does not dispute that the complaints lodged against her were not only from students, but from faculty, alumni, and staff. Nor does she demonstrate that a larger number of students complained about the job performance of male or younger employees, yet no corrective action was taken. She avers that student complaints regarding other services were not documented. Plaintiff fails to demonstrate that any of these other complaints were in writing and sent to either Anderson or Lunning. Ms. Lunning and Mr. Anderson testified to nothing more than the fact that students generally complain; e.g., about the lack of women on campus, variety of food offered in cafeteria, etc. This testimony is insufficient to allow a reasonable jury to conclude that the decision to terminate plaintiff's employment was based on age or gender.
[10] Furthermore, plaintiff only cites a portion of Anderson's deposition testimony. His entire testimony on this matter is as follows:

Q. Have you ever spoken to Mister Kroger [sic] prior to December 1st, of 1993, regarding working at Parks College in Career Services?
A. Yes.
Q. And when was the first time you spoke to him about that?
A. I spoke to him when there was an admissions vacancy. He had indicated to me that he was interested in some sort of related but different work than career services.
And I advised him that there was an admissions vacancy on the Frost Campus and told him how to go about applying for it.
Anderson Deposition, pg. 118. Anderson's admission of speaking to Kroeger prior to December 1st relates to a conversation regarding a position in the Admissions department on the main Frost campus; not replacing the plaintiff.